UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

FEDERICA VICUNA and MARTIN VARELAS,

              Plaintiffs,

– against –

O.P. SCHUMAN & SONS, INC., S.K.S. EQUIPMENT CO., and AMERIPAK INC.,

              Defendants.

**AMENDED**
**MEMORANDUM & ORDER**

13-CV-2834 (ERK) (VVP)

---

KORMAN, J.:

Plaintiffs Federica Vicuna and Martin Varelas brought this action against O.P. Schuman & Sons, Inc. ("Schuman"), S.K.S. Equipment Co. ("S.K.S"), and AmeriPak Inc. alleging claims sounding in strict product liability, failure to provide proper warnings, breach of express and implied warranties, and negligence based on a workplace injury Vicuna sustained while using a machine manufactured by S.K.S. Schuman, the only remaining defendant, has moved for summary judgment on the plaintiffs' successor liability and failure to warn claims.

## BACKGROUND

**A.**    **Factual Background**

On February 22, 2012, Vicuna, a New York domiciliary, was injured while using a Model 60 horizontal wrapper at her work for Muffins 'n' More in Brooklyn, New York. The horizontal wrapper—manufactured by S.K.S., a Pennsylvania corporation—uses a conveyor belt to move baked goods to the point of operation where plastic film is wrapped around them and then heat-sealed by a descending heating element. While operating the machine in manual mode—as she had been instructed by her employer, but contrary to the operations manual—three of her fingers were crushed and burned by the descending heating element, requiring amputation

1

of two of her fingers. Sterner Dep. 115:5-7; Vicuna Dep. 10:23-11:9, 37:4-18. Unlike when the machine runs in automatic mode, the horizontal wrapper can run in manual mode without a polycarbonate guard in place to protect the operator from coming into contact with the heating element. Sterner Dep. 47:18-49:16. Vicuna's employer directed her to put her hand very close to the machine's point of operation while adjusting the baked goods to ensure that they were not damaged during the wrapping process. Vicuna Dep. 54:10-25. She was never given a copy of the operator manual or other written instructions for the machine. *Id.* at 29:22-30:15, 32:7-18. Vicuna testified that she did not remember seeing any warning decals on the machine the day of the accident. *Id.* at 49:12-17. She also testified that she did not realize that placing her fingers near the machine's moving parts was dangerous and says that she would not have operated the machine in the way she did had she known of the danger. *Id.* at 49:18-50:19, 53:8-14.

The Model 60 horizontal wrapper that Vicuna was using when she suffered her injury was the first of a line of wrapping products marketed by S.K.S. under the AmeriPak brand name. Sterner Dep. 34:15-12; Schuman Website, Pl.'s Ex. 11. S.K.S. discontinued manufacturing the Model 60 wrapper in 1999 and the last machine of that model was sold in 2004, although production continued on other models in the AmeriPak line. Schuman Aff., Def.'s Ex. F ¶ 10. Although S.K.S. thrived for a period, by 2004 its sales had decreased and it was forced to either sell the business or allow the bank to take it over. Sterner Dep. 37:14-21, 38:13-21.

In December 2004, Schuman and S.K.S., both Pennsylvania corporations, entered into an Asset Purchase Agreement in which Schuman purchased certain S.K.S. assets for $300,000. Asset Purchase Agreement ¶¶ 1, 2. The primary purpose of the agreement was for Schuman to obtain the AmeriPak product line and continue it under its own control. Schuman Dep. 22:4-15, 51:20-24. Schuman obtained blueprints and patents for the AmeriPak line of machines. Sterner Dep. 75:11-76:19. Schuman also obtained the goodwill that came with the AmeriPak line along

with a list of customers and purchase records. Schuman Dep. 40:2-19, 60:2-8, 60:23-61:19. After Schuman purchased S.K.S.'s assets, all eight S.K.S. employees joined Schuman. Sterner Dep. 36:3-14; Schuman Dep. 63:19-22; O'Shea Dep. 55:23-57:17.

The purchase agreement required S.K.S. to refrain from engaging "in any business or other activity, except as required to wind up and dissolve the corporation." Asset Purchase Agreement ¶ 20. S.K.S. was not, however, formally dissolved because the accountant who was to have filed the paperwork dissolving the corporation died before he could do so. Sterner Dep. 38:1-12. While S.K.S. was never formally dissolved, the purchase agreement disposed of S.K.S.'s last potentially profit-bearing assets, *id.* at 117:4-7, and led to S.K.S. ending its operations, *id.* at 37:22-24. S.K.S. currently has no assets or liability insurance. *Id.* at 38:13-19. In addition to the above provisions, the agreement stated that Schuman "shall not assume any debts, liabilities, or obligations of [S.K.S.], including those associated with any potential products liability suits." Asset Purchase Agreement ¶ 3.

Approximately seven weeks before Vicuna's injury, her employer, Muffins 'n' More, contacted Schuman to request an operator's manual for the Model 60 horizontal wrapper and some spare machine parts. Schuman Dep. 105:14-106:17, 110:10-24; Manual Invoice, Pl.'s Ex. 12, Def.'s Ex. Q; Parts Invoice, Pl.'s Ex. 13. Muffins 'n' More had not purchased any parts from Schuman prior to that time, nor is there any evidence of contact after that point. Schuman Dep. 112:6-113:14. Schuman mailed to Muffins 'n' More an operators manual for the machine that included a personalized cover page and designated AmeriPak as "a division of O.P. Schuman and Sons, Inc." although the substance of the manual was written by S.K.S. Sterner Dep. 44:19-45:17. The parties do not dispute that Muffins 'n' More never contacted Schuman about servicing their horizontal wrapper machine and that Schuman never made a service call to Muffins 'n' More. Pl.'s Rule 56.1 Statement ¶¶ 82, 86.

B.  **Procedural Background**

Plaintiffs filed suit against Schuman on May 14, 2013, asserting claims sounding in strict product liability, failure to provide proper warnings, breach of express and implied warranties, and negligence. A fifth cause of action is a derivative claim for loss of services on behalf of Vicuna's husband, Martin Varelas. Dkt # 1. On July 17 of the same year, plaintiffs filed an amended complaint adding S.K.S. and AmeriPak Inc. as defendants. Dkt. # 4. This court denied Schuman's motion to dismiss for failure to state a claim in an order dated April 22, 2014, and directed that the motion should be re-filed as a Rule 56 motion for summary judgment. Subsequently, on June 19, 2014, plaintiffs filed a stipulation discontinuing their action against AmeriPak without prejudice. Dkt. # 27. The next day, plaintiffs filed a request for a certificate of default against S.K.S. for failure to plead or otherwise defend the action. Dkt. # 29. Default was entered on August 15, 2014. Dkt. # 40. In addition, Schuman has filed a cross-claim against S.K.S. Dkt. # 36. After discovery, which focused on the questions of successor liability and the failure to warn, Schuman moved for summary judgment on March 16, 2015. Dkt. # 47.

## ANALYSIS

A.  **Standard of Review**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether there is a genuine issue of material fact, the court must resolve all ambiguities, and draw all inferences, against the moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Nevertheless, the non-moving party may defeat

summary judgment only by producing evidence of specific facts that raise a genuine issue for trial. *Anderson*, 477 U.S. at 256. "Conclusory allegations will not suffice to create a genuine issue," and "[t]here must be more than a 'scintilla of evidence'" to defeat a summary judgment motion. *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252).

**B.     Successor Liability**

There is no dispute that Schuman did not design, manufacture, or sell the machine that allegedly caused Vicuna's injuries. Pl.'s Rule 56.1 Statement ¶ 23. Rather, those activities were performed by S.K.S., which subsequently sold certain of its assets to Schuman. Thus, Schuman can be held strictly liable for any defects in the product only through successor liability. The resolution of this issue requires a choice of law analysis. Before turning to that analysis, I pause to address Schuman's argument that Vicuna's successor liability claim suffers from procedural flaws. In a short paragraph devoid of citations to authority or the record beyond a general citation to the amended complaint, Schuman asserts that Vicuna's complaint "fails to articulate a theory of successor liability." Def.'s Mem. Supp. Summ. J. 9. The brevity of this argument is matched—if not exceeded—by Vicuna's response which baldly asserts (also without reference to legal authorities or the record) that the successor liability claim had been properly pled, but requesting leave to amend the complaint if necessary. Pl.'s Mem. Opp. Summ. J. 40. The paucity of briefing aside, Schuman's argument lacks merit. Vicuna's amended complaint alleges facts sufficient to establish a claim of successor liability. Specifically, the complaint alleges that Schuman purchased certain assets and liabilities from S.K.S. and that Schuman assumed the position of manufacturing, selling, and marketing the product line at issue. Am. Compl. ¶¶ 58-59. While spare, this is enough to satisfy the requirements of Rule 8 for a successor liability claim. *See Premier Pork, LLC v. Westin, Inc.*, No. 07-CV-1661, 2008 WL 724352, at *4 (D.N.J.

5

Mar. 17, 2008); *Kuhns Bros., Inc. v. Fushi Int'l, Inc.*, No. 3:06-CV-1917, 2007 WL 2071622, at * 3-4 (D. Conn. 2007); *Pennsylvania Dep't of Envtl. Prot. v. Concept Scis., Inc.*, 232 F. Supp. 2d 454, 461 (E.D. Pa. 2002).

1. **Applicable Law**

The parties dispute whether New York or Pennsylvania law should apply to plaintiffs' successor liability claims. In both states, a corporation that acquires the assets of another is generally not liable for the torts of its predecessor. *Schumacher v. Richards Shear Co., Inc.*, 59 N.Y.2d 239, 244-45 (N.Y. 1983); *Continental Ins. Co. v. Schneider, Inc.*, 873 A.2d 1286, 1291 (Pa. 2005). Pennsylvania law, however, recognizes the product line exception to this rule. Under this exception, a corporation is liable for the acts of its predecessor where the corporation acquires substantially all of another corporation's assets and undertakes essentially the same operation as the selling corporation. *Kradel v. Fox River Tractor Co.*, 308 F.3d 328, 331 (3d Cir. 2002). New York, by contrast, does not recognize the product line exception. *Semenetz v. Sherling & Walden, Inc.*, 7 N.Y.3d 194, 201 (N.Y. 2006). Because New York law provides greater protection to a successor corporation, the remaining defendant, a Pennsylvania corporation, argues that New York law should apply here.

In a diversity action, a federal district court must apply the choice-of-law principles of the state in which it sits. *See Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496 (1941). Where the laws of two jurisdictions appear to conflict with one another, the New York Court of Appeals has instructed that courts must conduct an "interest analysis"—an analysis of the purpose of the underlying laws—to determine which applies. *GlobalNet Financial.com, Inc., v. Frank Crystal & Co., Inc.*, 449 F.3d 377, 384 (2d Cir. 2006); *Padula v. Lilarn Properties Corp.*, 644 N.E.2d 1001, 1002 (N.Y. 1994). This analysis begins by examining the location of the contacts each jurisdiction has with the event giving rise to the cause of action. "[T]he only

6

facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." *Schultz v. Boy Scouts of America*, 480 N.E.2d 679, 684 (N.Y. 1985) (citations omitted). "Once these contacts are discovered and analyzed they will indicate (1) that there exists no true conflict of laws, . . . as in most choice of law cases, or (2) that a true conflict exists, i.e., both jurisdictions have an interest in the application of their law." *Matter of Crichton*, 228 N.E.2d 799, 806 n.8 (N.Y. 1967) (Keating, *J.*). Where no true conflict exists, the law of the only jurisdiction with an interest in the application of its law will be applied. *See, e.g.*, *Tooker v. Lopez*, 249 N.E.2d 394 (N.Y. 1969) (Keating, *J.*).

There is no true conflict in this case. The injured plaintiff is a New York domiciliary. New York has a "significant interest in affording a remedy to its own domiciliaries who are injured as a result of the negligence of another." *O'Connor v. U.S. Fencing Ass'n*, 260 F. Supp. 2d 545, 557 (E.D.N.Y. 2003); *see also Fargas v. Cincinnati Mach., LLC*, 986 F. Supp. 2d 420 (S.D.N.Y. 2013) (New York has a "legitimate interest in protecting its residents from defective products even in cases in which the product was delivered a long time ago"). New York also has a countervailing interest in protecting its domestic corporations from successor liability. Indeed, it has been held that "the state of incorporation has the greater interest in determining when and if that insulation is to be stripped away" because "a corporation is a creature of state law whose primary purpose is to insulate shareholders from legal liability." *Soviet Pan Am Travel Effort v. Travel Comm., Inc.*, 756 F. Supp. 126, 131 (S.D.N.Y. 1991). Where this interest in not implicated—for instance, because the corporation in question is incorporated in a different state—New York's sole interest is in ensuring that its domiciliaries are able to obtain relief from injuries in tort. Likewise, Pennsylvania, which has an interest in defining the rights and responsibilities of its domestic corporations and insulating them from liability, would permit recovery under the product line exception to the successor liability rule. Because New York's

interests are fulfilled through the application of Pennsylvania law and no Pennsylvania interest is harmed, Pennsylvania law should apply.

This result is consistent with the test set out in what is referred to as the third *Neumeier* rule. *Neumeier v. Kuehner*, 286 N.E.2d 454, 458 (N.Y. 1972). This rule is the third in a series of rules that Chief Judge Fuld formulated to deal with various circumstances that arise in choice of law cases. These rules reflected what Judge Friendly described at the time as the "new practice of fashioning 'guideline decisions,' formerly known as dicta, which . . . suffer the danger and pitfalls that usually go with judging in a vacuum and are apt in their application to carry unintended consequences which once accomplished are not easy to repair . . . ." Henry J. Friendly, *Remarks at Proceedings of the Bar of the Supreme Court of the United States In Memoriam of Justice Harlan,* 92 S.Ct. 1, 30 (1972) (internal quotation omitted). Indeed, when Judge Fuld initially promulgated his three rules—the second and third rules were not based on any New York Court of Appeals case. *See Tooker*, 249 N.E.2d at 404 (Fuld, *J.*, concurring). Instead, he pulled them from thin air.

While Chief Judge Fuld's rules were addressed to guest statute cases, which involve the application of laws limiting the liability of an automobile driver to his passenger, these rules are not limited to such cases. *Cooney v. Osgood Mach., Inc.*, 612 N.E.2d 277 (N.Y. 1993). Instead, they apply to other loss-allocating rules "that prohibit, assign, or limit liability after the tort occurs." *Padula*, 644 N.E.2d at 1003. The first *Neumeier* rule addresses cases in which the guest passenger and host driver are domiciled in the same state in which the car is registered. S*ee Tooker*, 249 N.E.2d 569. Judge Keating, who has been described as "the persistent, consistent, and ultimately prevailing champion of governmental interest analysis of all conflict of laws problems," Hans W. Baade, *Judge Keating and the Conflict of Laws,* 36 Brook. L. Rev. 10, 15 (1969), explained why this was "one of the simplest in the choice of law area . . . [i]f the facts

are examined in light of the policy considerations which underlie the ostensibly conflicting laws . . . ." *Tooker,* 249 N.E.2d at 398.

Thus, he wrote that New York did not place any restriction on recovery by a guest. On the contrary, it has an affirmatively expressed legislative policy reflecting a strong interest in allowing "innocent victims of motor vehicle accidents [to] be recompensed for the injury and financial loss inflicted upon them." *Id.* (quoting N.Y. Vehicle and Traffic Law § 310). By contrast, the purpose of the Michigan guest statute is the "prevention of fraudulent claims against local insurers or the protection of local automobile owners . . . . This purpose can never be vindicated when the insurer is a New York carrier and the defendant is sued in the courts of this State. Under such circumstances, the jurisdiction enacting such a guest statute has absolutely no interest in the application of its law." *Id.* at 397. In sum, Judge Keating concluded:

> New York's "grave concern" in affording recovery for the injuries suffered by Catharina Tooker, a New York domiciliary, and the loss suffered by her family as a result of her wrongful death, is evident merely in stating the policy which our law reflects. On the other hand, Michigan has no interest in whether a New York plaintiff is denied recovery against a New York defendant where the car is insured here.

*Id.* at 398. The holding in *Tooker*, which is codified in the first *Neumeier* rule, applies the law of the common domicile as opposed to the place of the injury.

By contrast, the second *Neumeier* rule adopts a place of injury test for true conflict guest statute cases, s*ee Cooney*, 612 N.E.2d at 281, for example, in a case in which a car registered in Canada and driven by a Canadian injures a New York passenger in Ontario. In such a case, both jurisdictions have an interest in the application of their law and the second *Neumeier* would suggest the application of the law of the place of the injury. Nevertheless, the second *Neumeier* rule is not inflexible and is subject to an exception created by the "less categorical" third *Neumeier* rule. *Neumeier*, 186 N.E.2d at 458. More specifically, it suggests that "the applicable

rule of decision will be that of the state where the accident occurred but not if it can be shown that displacing that normally applicable rule will advance the relevant substantive law purposes without impairing the smooth working of the multi-state system or producing great uncertainty for litigants." *Id.*; *see Schultz*, 480 N.E.2d 679. The circumstances in the present case clearly warrant displacing New York law with respect to the liability of successor corporations. Applying Pennsylvania law here "will not frustrate [New York's] interests because New York has no significant interest in applying its own [successor liability] law to this dispute." *Id.* at 687. Moreover, precisely because the choice of law of the forum state results in the application of the substantive law of its sister state, it does not impair "the smooth working of the multi-state system." Nor does applying Pennsylvania law to a Pennsylvania corporation provide "great uncertainty for litigants." A Pennsylvania corporation could hardly find itself surprised by the application of the law of the state of its incorporation in determining its liability. In sum, the third *Neumeier* rule would always result in the displacement of the normally applicable situs rule in cases in which there is no true conflict.[1] This is such a case.

## 2. Merits

In this motion for summary judgment, Schuman does not argue that the law of strict product liability does not apply to the machine that allegedly caused Vicuna's injuries. Instead, its argument is focused solely on whether it can be held liable as a successor corporation for whatever liability results from Vicuna's injury. Accordingly, I address only whether Schuman can be held liable as a successor to the original manufacturer under Pennsylvania law.

Under Pennsylvania law, "it is well-established that when one company sells or transfers all of its assets to another company, the purchasing or receiving company is not responsible for

---

[1] Indeed, in *O'Connor v. U.S. Fencing Ass'n*, 260 F. Supp. 2d 545, 554-56, 559-61 (E.D.N.Y. 2003), I discuss the *Neumeier* rules and show that they are largely consistent with the interest analysis, even though the rules do not invoke the analysis *in haec verba*.

the debts and liabilities of the selling company simply because it acquired the seller's property." *Continental Ins. Co. v. Schneider, Inc.*, 873 A.2d 1286, 1291 (Pa. 2005) (internal quotation omitted); *see also Childers v. Power Line Equip. Rentals, Inc.*, 681 A.2d 201, 212 (Pa. Super. Ct. 1996). Liability can be established in the successor, however, if the plaintiffs can establish that: (1) the purchaser expressly or implicitly agreed to assume liability, (2) the transaction amounted to a consolidation or merger, (3) the purchasing corporation was a mere continuation of the selling corporation, (4) the transaction was a fraudulent attempt to escape liability, (5) the transfer lacked adequate consideration and no provisions were made for creditors of the selling corporation, or (6) the successor undertook to conduct the same manufacturing operation of the seller's product lines in essentially an unchanged manner. *Id.* Because it is clear that a jury could find that Schuman falls within the product line exception, I focus my analysis there.

As stated earlier, Pennsylvania law, unlike New York law, recognizes the product line exception to the general rule precluding successor liability. *Dawejko v. Jorgensen Steel Co.*, 434 A.2d 106, 111 (Pa. Super. Ct. 1981).[2] Under this exception:

> [W]here one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.

*Kradel v. Fox River Tractor Co.*, 308 F.3d 328, 331 (3d Cir. 2002) (quoting *Dawejko*, 434 A.2d at 110). In addition, courts should give "more flexible consideration of other relevant factors,"

---

[2] The Pennsylvania Supreme Court has "not yet decided on developed reasoning whether to adopt" the product line exception. *Schmidt v. Boardman Co.*, 11 A.3d 924, 944 (Pa. 2011). Instead, the exception arises from decisions of the Superior Court, the state's intermediate appellate court. *See Dawejko v. Jorgensen Steel Co.*, 434 A.2d 106, 111 (Pa. Super. Ct. 1981). Federal courts follow intermediary state court decisions "in the absence of convincing evidence that the highest court of the state would decide differently." *Stoner v. New York Life Ins. Co.*, 311 U.S. 464, 466 (1940). Federal courts applying Pennsylvania law have generally assumed that the Pennsylvania Supreme Court would adopt the exception and applied the rule accordingly. *See Kradel v. Fox River Tractor Co.*, 308 F.3d 328, 331 (3d Cir. 2002); *LaFountain v. Webb Indus. Corp.*, 759 F. Supp. 236, 240-41 (E.D. Pa. 1991) (collecting cases).

11

though these factors are not mandatory. *Schmidt v. Boardman Co.*, 11 A.3d 924, 945 (Pa. 2011). The factors to be considered are:

> (1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading [role], and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business.

*Kradel*, 308 F.3d at 331-32 (quoting *Dawejko*, 434 A.2d at 109).[3] Pertinent factors for determining whether these criteria are met include "whether the successor corporation advertised itself as an ongoing enterprise; whether it maintained the same product name, personnel, property and clients; [and] whether it acquired the predecessor corporation's name and good will and required the predecessor to dissolve." *Amader v. Pittsburgh Corning Corp.*, 546 F. Supp. 1033, 1036 (E.D. Pa. 1982); *see also Dawejko*, 434 A.2d at 111. Notably, a successor corporation can be held liable if it continued the same general line of business even if it did not produce the exact same product as its predecessor. *Van Doren v. Coe Press Equip. Corp.*, 592 F. Supp. 2d 776, 788 (E.D. Pa. 2008). "Courts applying the product line exception have consistently found that the question of whether each particular required factor has been satisfied is a question for the jury." *Id.* (collecting cases).

*Van Doren v. Coe Press Equipment Corp.*, 592 F. Supp. 2d 776, 788 (E.D. Pa. 2008), provides a useful illustration as to how the product line exception is applied. There, the district judge found that the successor corporation had acquired substantially all of its predecessor's assets where it had purchased the designs and engineering drawings of the product, the customer

---

[3] Based on the Pennsylvania Superior Court's decision in *Hill v. Trailmobile, Inc.*, 603 A.2d 602 (Pa. Super. Ct. 1992), the Third Circuit in *Kradel* indicated that Pennsylvania courts treated this second set of considerations as mandatory requirements. *Kradel*, 308 F.3d at 332. *Hill*, however, was subsequently abrogated by the Pennsylvania Supreme Court's decision in *Schmidt*, 11 A.3d 924, (decided nine years after *Kradel*) which confirmed that the second set of factors were not mandatory.

12

and advertising records, the right to use the predecessor's name in advertisements, and equipment and machine parts, and where the owner of the predecessor business testified that he understood that he was selling his company. *Van Doren*, 592 F. Supp. 2d at 788. The district judge also found that there was a genuine question of material fact as to whether the successor undertook the same manufacturing operations as its predecessor where the successor hired at least eight employees—including an engineer—from the predecessor to work exclusively on the newly purchased product line, the successor continued to produce the line without making specific design improvements, and the owner of the successor corporation testified that the machines were different designs within a single product line. *Id.* at 789. Moreover, the district judge found that the non-mandatory factors had been satisfied as well because the predecessor corporation closed its doors at about the time the successor purchased its assets, the successor's acquisition of all intellectual property related to the products provided it with the ability to estimate the risks involved, and the successor benefitted from the goodwill associated with the predecessor corporation's name and customer records. *Id.* at 789-90.

Here, a jury could find that both the mandatory and non-mandatory factors for determining successor liability under the product line exception have been met. First, there is evidence to suggest that Schuman acquired substantially all of S.K.S.'s manufacturing assets. William Schuman, the company's current president, testified in deposition that the primary purpose of the Asset Purchase Agreement was to obtain the AmeriPak product line. Schuman Dep. 22:4-15, 51:20-24. To that end, Schuman obtained blueprints and patents for the AmeriPak line of machines. Sterner Dep. 75:11-76:19. Moreover, after the Asset Purchase Agreement, S.K.S. had essentially nothing left. *Id.* at 117:4-7, 88:22-90:5. This was by design as the purchase agreement called for the winding up and dissolution of S.K.S. Asset Purchase Agreement ¶ 20. Even if some miscellaneous S.K.S. assets unrelated to the AmeriPak line

remained after the purchase agreement, that fact is immaterial because "only those assets that are directly related to the product line at issue are relevant for determining whether the successor purchased substantially all of the predecessor's assets." 3 Summ. Pa. Jur. 2d Torts § 41:84 (2d ed.) (citing *Schmidt*, 11 A.3d 924). Indeed, defendants have not contested that they acquired substantially all of S.K.S.'s manufacturing assets for the AmeriPak line.

Second, there is evidence from which a jury could conclude that Schuman undertook essentially the same manufacturing operation as S.K.S. after the Asset Purchase Agreement. Several S.K.S. employees became Schuman employees, filling largely the same roles on the AmeriPak line of products. Schuman Dep. 33:13-24, 36:16-22, 63:19-22; Sterner Dep. 36:3-14. More tellingly, after the purchase agreement, Schuman manufactured, sold, and serviced a series of AmeriPak horizontal wrappers without making any specific design improvements. Def.'s Resp. to Interrog. ¶¶ 7-10; Sterner Dep. 35:9-17. And while Schuman did not manufacture the particular model of horizontal wrapper involved in Vicuna's injury, it did provide support and replacement parts for that model. AmeriPak Model 60 Operator's Manual, Def.'s Ex. I, Pl.'s Ex. 1; Sales Order, Pl.'s Ex. 13. In any event, Schuman's level of involvement with that exact model is irrelevant so long as it continued in the same general line of business. *Van Doren*, 592 F. Supp. 2d at 788.

In addition, plaintiffs have submitted sufficient evidence for a jury to conclude that the non-mandatory factors have also been met. It would be possible for a jury to determine that plaintiffs' remedies against S.K.S. had been virtually destroyed by the Asset Purchase Agreement given that the agreement disposed of S.K.S.'s last potentially profit-bearing assets, Sterner Dep. 117:4-7, led to S.K.S. ending its operations, *id.* at 37:22-24, and required that S.K.S. wind up and dissolve, Asset Purchase Agreement ¶ 20. Schuman argues that the default judgment entered against S.K.S. in this case, *see* Dkt. # 40, means that this prong cannot be met

because Vicuna still has a remedy of law against S.K.S. But S.K.S. exists at this point entirely as a paper organization and only in that form because the accountant who was supposed to file the dissolution paperwork died before he could do so. Sterner Dep. 38:1-9. S.K.S. has no assets or liability insurance from which Vicuna could recover. *Id.* at 38:13-19. Thus, while Vicuna may be legally entitled to recover from S.K.S., a jury might conclude that the Asset Purchase Agreement made such recovery actually impossible. Ruling that, as a matter of law, the existence of a paper-only corporation can defeat successor liability would provide an easy avenue for successor corporations to escape their rightful liabilities.

Moreover, Schuman's acquisition of the customer records, patents, and blueprints for the AmeriPak line of wrappers could provide grounds for a jury to determine that it has the ability to assume S.K.S.'s original risk-spreading role. Where a company acquires the intellectual property related to a line of products, it also acquires "the ability to estimate the risks involved with the product and spread those risks out to consumers in costs." *Van Doren*, 592 F. Supp. 2d at 790. Here, Schuman obtained both the patents and blueprints along with the customer records for the AmeriPak line of products. Schuman Dep. 30:8-13, 40:2-13, 60:23-61:19; Sterner Dep. 44:5-13, 75:11-76:10. Thus, there is a genuine dispute as to whether Schuman had the ability to assume the risk-spreading role originally held by S.K.S.

Finally, there is sufficient evidence for a jury to conclude that, in fairness, Schuman should assume the responsibility for a defective product manufactured by S.K.S. because it benefitted from the goodwill attached to S.K.S. as it continued operation of the business. In his deposition, William Schuman testified that his company had obtained the goodwill associated with the AmeriPak line. Schuman Dep. 60:2-8. Indeed, Schuman intentionally maintained the branding of the AmeriPak products to garner the benefit from the goodwill and reputation of the brand in the wrapping industry. *Id.* at 77:24-78:6, 99:6-23. Likewise, Schuman reached out to

the existing AmeriPak customer list to offer its services as a continuing enterprise. *Id.* at 40:14-41:14, 85:13-23. While the purchase agreement does not indicate a purchase price for goodwill, Asset Purchase Agreement ¶ 2, these actions nonetheless indicate an attempt to benefit from the reputation and goodwill associated with the AmeriPak line of wrapping machines. As such, there is a dispute of fact from which a jury could conclude that it is fair that Schuman assume the responsibility for defective products manufactured under the AmeriPak name while it was owned by S.K.S.

In sum, Vicuna has presented sufficient evidence for a jury to determine that all of the prongs of the product line exception test have been satisfied. As such, Schuman's motion for summary judgment on the issue of successor liability is denied. Because the availability of the product line exception is sufficient to defeat summary judgment, there is no need to consider the other exceptions to the general rule barring successor liability.

**C.     Failure to Warn**

Plaintiffs also allege that, independent of any liability it may have assumed as a successor to S.K.S., Schuman can be held liable for failure to warn in its own right. Pl.'s Mem. Opp. Summ. J. 35. Under this theory, Schuman could be found liable for failure to warn both for the failures of S.K.S. and for its own failures. I now turn to this claim.

**1.     Applicable Law**

The parties here agree that New York law applies to plaintiffs' failure to warn claims. Mem. Opp. Summ. J. 35 n.6. Thus, New York's law controls. *Celle v. Filipino Reporter Enter. Inc.*, 209 F.3d 163, 175 (2d Cir. 2000) ("Since no party has challenged the choice of New York libel law, all are deemed to have consented to its application."); *accord Krumme*, 238 F.3d at 138; *Meisel*, 651 F. Supp. 2d at 109.

### 2. Merits

New York law is clear that a plaintiff can recover in a strict products liability suit when a manufacturer fails to provide adequate warnings as to the product's use. *Rastelli v. Goodyear Tire & Rubber Co.*, 591 N.E.2d 222, 225 (N.Y. 1992). "A manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of its products of which it knew or should have known." *Id.* Indeed, this duty to warn can extend beyond the purchasers of the product to the employees of those purchasers. *McLaughlin v. Mine Safety Appliances Co.*, 181 N.E.2d 430, 433 (N.Y. 1962). The product itself does not have to be defective provided that a warning is needed to avoid some danger in its operation. *N.Y. Products Liability 2d* § 17:2 (2015).

A successor corporation may have a duty to warn purchasers of a product manufactured by the corporation's predecessor where there is some "special relationship" between the successor and the purchaser. *Sullivan v. Joy Mfg. Co.*, 517 N.E.2d 1313, 1314 (N.Y. 1987); *Schumacher v. Richards Shear Co., Inc.*, 451 N.E.2d 195, 199 (N.Y. 1983). In *Sullivan*, the New York Court of Appeals held that a single service call is not sufficient to establish the required special relationship. 517 N.E.2d at 1314. The Appellate Division echoed this reasoning in *Goldman v. Packaging Indus., Inc.*, 534 N.Y.S.2d 388, 391-92 (N.Y. App. Div. 1988), when it held that a successor corporation had no duty to warn the plaintiff where the successor made only a single service call to plaintiff's employer, there was no service contract, the successor attempted to avoid servicing such machines, and there were no systematic contacts between the successor and employer. In contrast, in *Schumacher*, the Court of Appeals held that evidence had been presented to defeat summary judgment where the successor corporation knew the location and owner of the machine and actively offered to service it, the successor held itself out as having expertise in the product, and offered to service the machine in question. 451 N.E.2d at 200. Likewise, a question of fact existed as to whether a successor had a duty to warn the

plaintiff where the successor provided service to plaintiff's employer, there had been subsequent business contact between the successor and the employer, and there may have been a service contract between the successor and the employer. *Colon v. Multi-Pak Corp.*, 477 F. Supp. 2d 620, 625-26 (S.D.N.Y. 2007).

The plaintiffs here have not presented sufficient evidence to establish a special relationship between Schuman and Vicuna's employer. Indeed, the only contact established between Schuman and Muffins 'n' More was the sale of an operator's manual (albeit with a personalized cover page) and a few replacement parts. This degree of contact falls short even of the single service call deemed insufficient in *Sullivan*. Indeed, there is no evidence of an offer on the part of Schuman to service the machine, no service contract, and no subsequent—to say nothing of systematic—contacts between Schuman and Muffins 'n' More before or after that single interaction. *Cf. Goldman*, 534 N.Y.S.2d at 391-92; *Colon*, 477 F. Supp. 2d at 625-26. Despite Schuman succeeding S.K.S. in operation of the AmeriPak product line, there is no indication in the record that it had a special relationship with Muffins 'n' More sufficient to raise a genuine question of fact as to its duty to warn Vicuna regarding the horizontal wrapper. Because Schuman had no duty to warn Vicuna regarding the machine, it is unnecessary to consider whether the lack of warnings was a proximate cause of Vicuna's injury. Separate and apart from whatever liability was assumed from S.K.S. as a successor corporation, Schuman's motion for summary judgment is granted as it relates to plaintiffs' failure to warn claim regarding Schuman's actions or failures to act.

## CONCLUSION

The defendant's motion for summary judgment is denied as to plaintiffs' successor liability cause of action and granted as to plaintiffs' failure to warn cause of action.

**SO ORDERED.**

Brooklyn, New York
May 14, 2015
Amended: May 19, 2015

*Edward R. Korman*
Edward R. Korman
Senior United States District Judge