UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FEDERICA VICUNA and MARTIN VARELAS,

                            Plaintiffs,

        – against –

O.P. SCHUMAN & SONS, INC., S.K.S.
EQUIPMENT CO., and AMERIPAK INC.,

                            Defendants.

**MEMORANDUM & ORDER**

13-cv-2834-ERK

KORMAN, *J.*:

Plaintiffs Federica Vicuna and her husband Martin Varelas bring this action against S.K.S. Equipment Co. ("S.K.S."), AmeriPak, Inc. ("AmeriPak"), and O.P. Schuman & Sons, Inc. ("Schuman"). Plaintiffs allege numerous claims sounding in products liability based on a workplace injury that plaintiff Vicuna sustained while using a machine that S.K.S. manufactured under its AmeriPak brand name. S.K.S. is now a defunct company. Schuman has purchased much of the assets once under the control of S.K.S., including the AmeriPak brand name.

There are currently four motions pending. First, the plaintiffs move for reconsideration of my order dated May 19, 2015. That order granted Schuman's motion for summary judgment on the plaintiffs' so-called independent failure to warn claim. Second, Schuman moves to preclude the plaintiffs' proffered expert witness. Third, Schuman moves for summary judgment seeking dismissal of nearly all remaining claims outstanding against it. Fourth is the plaintiffs' motion for leave to amend their complaint.

# BACKGROUND

## I. Factual Background

On February 22, 2012, plaintiff Vicuna was injured while using a Model 60 packaging machine manufactured by S.K.S. *See* First Federica Vicuna Depo., Sept. 5, 2014, 10:1-17:17, ECF No. 47-2. This occurred during the course of her work for Muffins 'n' More, Inc. in Brooklyn, New York ("Muffins 'n' More" or "plaintiff's employer"). *Id.* The Model 60 is known in the packaging industry as a "horizontal wrapper." *See* Eng'g Report, Eric Heiberg, July 29, 2016, ECF No. 94-14, at 2-4. Model 60s use a conveyor belt to move baked goods towards a point of operation where plastic film is wrapped around them. *Id.* Once the plastic film covers the baked goods, the machine then cuts and seals the plastic film with a descending heating element that forms a pinch point. *Id.*

While operating a Model 60 in "manual mode," the plaintiff crushed and burned three of her fingers, requiring amputation. *See* AmeriPak Model 60 Operator's Manual, ECF No. 89-9, at 1-9; First Sterner Depo., Sept. 19, 2014, 115:5-7, ECF No. 47-5; First Vicuna Depo. 10:23-11:9; 37:4-18. Unlike when in "automatic mode," the Model 60 can run in manual mode without a polycarbonate guard in place to protect operators from contacting the pinch point. *See* Operator's Manual, at 1-9; First Sterner Depo. 47:18-49:16. Without the polycarbonate guard in place, the pinch point is exposed and an operator is free to place his or her hand into that area. Indeed, Vicuna's employer directed her to sometimes operate the Model 60 in manual mode so that she could place her hand very close to the pinch point area. This allowed her to adjust certain "small" baked goods so that they would not "bounce around" and become damaged at the pinch point. *See* First Vicuna Depo. 54:10-25. The plaintiff was performing this precise task when her accident occurred.

The operator's manual for the Model 60 expressly contemplates that operators will use the machine in manual mode for "setup" as well as for "jogging" of the machine. *See* Operator's Manual, at 1-9. The operator's manual also states that "GUARDS MUST BE IN PLACE BEFORE OPERATING." *Id.* at 1-7. Plaintiff Vicuna was apparently never given a copy of the operator's manual, nor any other written instructions for the machine. First Vicuna Depo. 29:22-30:15; 32:7-18. The plaintiff testified that she did not realize that placing her fingers near the machine's moving parts was dangerous. *Id.* at 49:18-50:19; 53:8-14. She testified that she would not have operated the machine in such a manner had she known of the danger. *Id.* She did not remember seeing any warning decals on the machine the day of the accident. *Id.* at 49:12-17.

A decal of some sort was in fact present on the Model 60 based on my review of a photograph taken in December 2012, roughly 9 months after the plaintiff's accident. In the photograph, the decal is difficult, if not impossible, to decipher. *See* Photograph AmeriPak Model 60, Dec. 4, 2012, ECF No. 98-1. Schuman asserts that the decal warned against placing an operator's hand near the pinch point. *See* Def.'s Reply Mem. Supp. Mot. Summ. J., Feb. 17, 2017, ECF No. 99, at 8-9. Importantly, whatever the decal portrayed, it appears that the decal was positioned such that an operator could see it only when the protective guard was horizontal and already secured in place, and not when the guard was vertical and unsecured—i.e., when a warning would be useful. *See* Photograph AmeriPak Model 60.

The Model 60 horizontal wrapper was the first in a line of wrapping machines that S.K.S. manufactured and marketed under the AmeriPak brand name. *See* First Sterner Depo. 34:15-24. S.K.S. discontinued the Model 60 around 1999. S.K.S. then sold the last machine of that model in 2004, though production continued on other models within the AmeriPak line. *See* William Schuman Aff., Sept. 12, 2013, ECF No. 47-7, at ¶ 10. Although S.K.S. thrived for a period, by

2004 its sales had decreased and it was forced to either sell the business or allow a bank takeover. *See* First Sterner Depo. 37:14-21; 38:13-21.

Around December 2004, defendant Schuman purchased certain S.K.S. assets for approximately $300,000. *See* Asset Purchase Agreement, ECF No. 47-1, at ¶¶ 1, 2. The primary purpose of the asset sale was for Schuman to obtain the AmeriPak product line and continue the line under its own control. *See* William Schuman Depo., Sept. 18, 2014, ECF No. 74-3, 22:4-15; 51:20-24. Indeed, Schuman obtained blueprints and patents for the AmeriPak line of machines. *See* First Sterner Depo. 75:11-76:19. Schuman also obtained the goodwill that came with the AmeriPak line along with a list of customers and purchase records. *See* Schuman Depo. 40:2-19; 60:2-8; 60:23-61:19. After Schuman purchased the assets of S.K.S., all eight S.K.S. employees joined Schuman. *See* First Sterner Depo. 36:3-14; Schuman Depo. 63:19-22; Jim O'Shea Depo., Sept. 19, 2014, ECF No. 49-4, 17:1-7; 55:23-57:20.

Numerous documents were brought from the S.K.S. facility to the Schuman facility following the asset purchase. Specifically, an engineering folder was brought to the Schuman facility. This folder contained a one-page "alternative electronic schematic" for the S.K.S. manufactured Model 60. *See* O'Shea Depo. 23:11-22; 27:2-5; 27:21-28:9; 53:6-15; 60:18-21; 61:2-12; Resp. to Pls.' Supp. Not. to Produce, June 27, 2016, ECF No. 98-4, at 5; Second Sterner Depo., July 5, 2016, ECF No. 89-5; 257:4-8. The alternative schematic provided a workaround design that, through rewiring, altered the Model 60. This alteration made it so that the Model 60 could not operate in any mode—neither automatic nor manual—without the polycarbonate guard in place to protect operators. *See* Second Sterner Depo. 255:10-256:5.

Whether Schuman technically purchased this engineering folder and the alternative schematic is unresolved on the record. Schuman asserts repeatedly that the folder and schematic

are "S.K.S. documents" and "not Schuman documents." *See, e.g.*, William Schuman Aff., Jan. 18, 2017, ECF No. 90-1, at ¶ 15. Schuman further claims that it was not aware of these documents until as late as July 2016, roughly three years after this litigation began. *See, e.g.*, Def.'s Mem. Opp'n Pls.' Mot. for Reconsideration, Jan. 20, 2017, ECF No. 90, at 6. Nevertheless, the documents have been stored at Schuman's facility since around the time of the S.K.S. asset sale in 2004. Moreover, at least two of Schuman's long-time employees testified that, at all pertinent times, they were readily familiar with these documents. *See* O'Shea Depo. 23:11-22; 27:2-5; 27:21-28:9; 53:6-15; 60:18-21; 61:2-12; First Sterner Depo. 16:1-8; 36:12-17; 44:10-13; Def.'s Mem. Opp'n Pls.' Mot. for Reconsideration, at 6.

Since its asset purchase in 2004, Schuman has continued designing and manufacturing the line of AmeriPak horizontal wrappers originally created by S.K.S. Today, however, Schuman incorporates rewiring similar (if not identical) in nature to that set out in the S.K.S. alternative electronic schematic mentioned above. *See* Eng'g Report, at 11. Thus, new wrappers manufactured by Schuman cannot operate in either automatic or manual mode unless the protective guard is secured in place. *See* Second Sterner Depo. 257:19-258:11.

Around January 2012, roughly seven years after the asset purchase and approximately seven weeks before plaintiff Vicuna's injury, her employer, Muffins 'n' More, contacted Schuman to request spare parts and an operator's manual for its Model 60 horizontal wrapper. *See* Schuman Depo. 105:14-106:17; 110:10-24; Manual Invoice, Jan. 5, 2012, ECF No. 49-12; Parts Invoice, Jan. 12, 2012, ECF No. 49-13. Soon after the request from Muffins 'n' More, Schuman mailed the desired spare parts and operator's manual. Muffins 'n' More had not purchased any parts from Schuman prior to this time. Nor is there any evidence of contact after this point. *See* Schuman Depo. 112:6-113:14.

The operator's manual included a personalized cover page designating AmeriPak as "a division of O.P. Schuman and Sons, Inc.," although the substance of the manual was written by S.K.S. *See* Operator's Manual, at 1; First Sterner Depo. 44:19-45:17. The second page of the manual was also personalized. It stated in effect that "this manual has been prepared for Muffins 'n' More" and then listed the contact information for the Schuman sales department. Operator's Manual, at 2. The operator's manual did not include any alternative schematics, not even the one-page alternative schematic that had been stored within the engineering folder described earlier. *See id.* The parties agree that Muffins 'n' More never contacted Schuman directly about servicing the Model 60 horizontal wrapper in question. They further agree that Schuman never made a service call to Muffins 'n' More. *See generally* Pls.' Mem. Opp'n Def.'s 1st Mot. Summ. J., March 16, 2015, ECF No. 49-18.

Review of the exhibits filed with the instant motions reveals that at least two other known accidents in addition to plaintiff Vicuna's have occurred involving Model 60 horizontal wrappers. First, depositions indicate that another accident occurred at Muffins 'n' More in 2014, two years after plaintiff Vicuna's accident. That accident involved the same exact underlying machine and resulted in another amputation. *See* Isabella Ortega Depo., March 17, 2016, ECF No. 98-7, 31:23-33:12. Second, plaintiffs have discovered that, in or around 1995, S.K.S. was sued in an Iowa lawsuit styled *Lindsey v. S.K.S. Equipment Co.* Pls.' Mem. Supp. Mot. for Reconsideration, at 8-9. That case involved another workplace accident. The machine in question there was a Model 60 with serial number 102—just one serial number higher than the Model 60 underlying this litigation, number 101. *See id.* The plaintiffs in the present case suspect that S.K.S. created the one-page alternative design schematic addressed earlier in response to the *Lindsey* case, possibly as part of a settlement there. *See id.*

## II.  Procedural Background & Belated Discovery Production

Plaintiffs filed suit against Schuman on May 14, 2013 for its role in plaintiff Vicuna's injuries, including Schuman's role as successor to S.K.S. The complaint asserted claims sounding in strict products liability, failure to provide proper warnings, breach of express warranty, breach of implied warranty, negligence, and loss of services on behalf of Vicuna's husband, Martin Varelas. *See generally* Compl., May 14, 2013, ECF No. 1. Plaintiffs later filed an amended complaint, which added S.K.S. and AmeriPak as defendants. *See* Am. Comp., July 17, 2013, ECF No. 4, at 1.

Schuman then filed a cross-claim against S.K.S. *See* Answer, Aug. 8, 2014, ECF No. 36, at 5. Schuman additionally filed a third-party complaint against Muffins 'n' More, plaintiff's employer. *See* 3d Party Compl., June 19, 2015, ECF No. 55. In turn, Muffins 'n' More filed counterclaims against Schuman. *See* Answer to 3d Party Compl., Aug. 6, 2015, ECF No. 61. Plaintiffs have voluntarily dismissed defendant AmeriPak. *See* Stip. & Order, June 30, 2014, ECF No. 30. The court clerk has entered default against S.K.S. for failure to plead or otherwise defend the action. *See* Entry of Default, Aug. 15, 2014, ECF No. 40. Thus, Schuman, Muffins 'n' More, and the plaintiffs are the only parties that remain active in this litigation.

On March 16, 2015, Schuman moved for summary judgment on the issue of successor liability. Schuman additionally moved for summary judgment as to plaintiffs' claim against Schuman for its "independent" failure to warn (i.e., Schuman's failure to warn plaintiff's employer about defects in the Model 60, notwithstanding that S.K.S. and not Schuman manufactured that machine). *See* Def.'s Mot. Summ. J., March 16, 2015, ECF No. 47. On May 19, 2015, applying Pennsylvania law, I denied Schuman's motion for summary judgment on successor liability. *See Vicuna v. O.P. Schuman & Sons, Inc.*, 106 F. Supp. 3d 286, 294–95 (E.D.N.Y. 2015). Applying

New York law, I granted Schuman's motion on the independent failure to warn claim, finding that the record did not show the requisite "special relationship" between Schuman and plaintiff Vicuna or her employer. *Id.* at 16-18. In short, while noting that Schuman might still be liable for warning failures as a successor to S.K.S., I held that New York law placed no independent duty to warn on Schuman, given its limited contact with the plaintiff and her employer. *See id.*

The plaintiffs ask me to reconsider today my independent failure to warn holding based on new evidence. The new evidence is that Schuman was in possession of the alternative electronic schematic at the time it provided plaintiff's employer with the operator's manual for the Model 60. *See* Pls.' Mem. Supp. Mot. for Reconsideration, at 8-9. Thus, the plaintiffs assert that, under the circumstances taken as a whole, this new evidence of Schuman's possession of the alternative design schematic tips the scale in favor of the plaintiffs on the issue of whether Schuman had an independent duty to warn. *See id.* at 22-24.

Critical to plaintiffs' assertion is their contention that Schuman withheld from discovery the alternative design schematic. *See id.* at 8-9. Indeed, discovery here has been long and convoluted. On May 28, 2014, plaintiffs served on Schuman a request for production. In that request, plaintiffs demanded "all documents, memorandum, notes, letters and/or complaints prepared by O.P. Schuman, received by O.P. Schuman, or maintained by O.P. Schuman related to the safety guards of the Model 60 Horizontal Wrapper" or "related to operating the Model 60 Horizontal Wrapper in manual mode." *See* Pls.' Not. to Produce, May 28, 2014, ECF No. 89-3, at ¶¶ 14, 15. Schuman responded to that request three months later, on August 28, 2014. *See* Schuman Supp. Resp. Not. to Produce, Aug. 28, 2014, ECF No. 89-4, at ¶¶ 14, 15. Schuman asserted that "none" of the plaintiffs' requested documents existed. *Id.*

Next, on September 19, 2014, during the deposition of a long-time Schuman employee, it appeared that, contrary to its earlier discovery responses, Schuman might be maintaining an engineering folder on the Model 60. Over the course of the deposition, it became clear that the folder might contain information relevant to the functionality and design of the Model 60, and possibly its safety guard. *See* O'Shea Depo. 60:13-66:11. During that deposition, counsel for the plaintiffs demanded that, if the engineering folder in fact existed at the Schuman facility, it be preserved and produced. *See id.* at 65:17-66:11. Schuman's counsel and Schuman's president both acknowledged this demand on the record. *Id.* The plaintiffs additionally followed-up regarding this matter with counsel for Schuman after the deposition, though the record does not detail the nature of the plaintiffs' follow-up. Ultimately, the plaintiffs were forced to seek an order from Magistrate Judge Kuo on June 2, 2016, directing Schuman to search for and produce the engineering folder. *See* Minute Entry, June 2, 2016. In short, Schuman did not provide the engineering folder—nor the one-page alternative schematic contained within that folder—until roughly two years after the September 2014 deposition. Indeed, Schuman's supplemental production of these documents as well as other previously unproduced documents began around June 27, 2016 and continued as late as September 12, 2016. *See* Resp. to Pls.' Supp. Not. to Produce, June 27, 2016, ECF No. 89-6, at ¶ 3; Supp. Resp. to Pls.' Post-Depo. Demands, Sept. 12, 2016, ECF No. 89-7, at 5.

By the time Schuman completed its supplemental production on September 12, 2016, it had been roughly 1.5 years since I granted Schuman's motion for summary judgment on the plaintiffs' independent failure to warn claim. Plaintiffs now argue that, had they possessed the engineering folder and alternative schematic at the time of Schuman's motion for summary judgment, they would have successfully defeated that motion. *See generally* Pls.' Mem. Supp.

Mot. for Reconsideration. They emphasize that the engineering folder contained the one-page alternative schematic that provided a workaround to prevent the Model 60 from operating in manual mode without proper guarding. *Id.* at 22-24. Plaintiffs further highlight that the alternative design set out in the one-page schematic is similar or identical to the current design of the AmeriPak wrappers that Schuman now produces. This information, plaintiffs argue, would have defeated Schuman's motion for summary judgment because Schuman's knowledge of a feasible alternative design helps to trigger an independent duty to warn under New York law. *Id.*

As for why Schuman failed to provide these documents upon plaintiffs' original request in May 2014, Schuman has offered no sound excuse. Instead, Schuman continues to argue that these documents are "not Schuman document[s]" and that Schuman's president was unaware of the existence of these documents until July 2016. *See* William Schuman Aff., Jan. 18, 2017, at ¶ 15. What is concerning here is that, in response to plaintiffs' May 2014 request for production, the record does not establish that Schuman put forth any particular effort that would have led to the discovery and production of the engineering folder or the alternative schematic.

Indeed, a long-time Schuman employee familiar with these documents testified that no one asked him to search for responsive documents. *See* O'Shea Depo. 62:1-3. Certainly, Schuman has not specified what actions, if any, it took to locate responsive documents in the time following plaintiffs' May 2014 request. Nor is there reason to believe that Schuman put forth any effort to locate responsive documents following the September 19, 2014 deposition, at which Schuman was informed that responsive documents might exist in its facility. *See* O'Shea Depo. 60:13-66:11.

Had it not been for the plaintiffs' investigatory work and its follow-up efforts, Schuman never would have made a supplemental production. Indeed, though I will not go into detail here, it was apparently through a third-party source that the plaintiffs found out about Schuman's likely

discovery failures. *See* Pls.' Mem. Supp. Mot. for Reconsideration, at 8-9. Upon uncovering

Schuman's potential discovery failures, the plaintiffs quickly began serving renewed demands for

depositions and document productions. *Id.* This eventually led to Schuman's supplemental

productions of documents that had been within its custody and control all along. *Id.*

## DISCUSSION

### I. Plaintiffs' Motion for Reconsideration

#### A. Procedure

The plaintiffs move for reconsideration of my May 19, 2015 order based on the newly

discovered one-page alternative design schematic that Schuman maintained during all pertinent

times but did not produce until 2016. The plaintiffs move pursuant to Rules 60(b) and 59(e) of the

Federal Rules of Civil Procedure. *See* Pls.' Mem. Supp. Reconsideration, at 2. I address each Rule

in turn.

Rule 60(b) is not a proper avenue for reconsideration here. The Rule provides that a district

court may grant a party relief from certain "final" orders in the event of, among other things, new

evidence:

> **(b) Grounds for Relief from a Final Judgment, Order, or Proceeding.** On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> \*\*\*
>
> **(2)** newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)

Fed. R. Civ. Pro. 60(b). The Advisory Committee Notes following Rule 60 state unequivocally

that only *final* orders fall within the scope of Rule 60(b). The Notes state that "[t]he addition of

the qualifying word 'final' emphasizes the character of the judgments, orders or proceedings from

which Rule 60(b) affords relief." Fed. R. Civ. P. 60(b), Advisory Committee Notes 1946 Amendment; *see also Fennell v. TLB Kent Co.*, 865 F.2d 498, 501 (2d Cir. 1989) (analyzing Rule 60 Advisory Committee Notes).

Judge Schofield recently addressed this issue, collecting a great number of useful authorities. Like the Advisory Committee Notes, Judge Schofield concludes that Rule 60(b) applies only to final orders. Importantly, Judge Schofield concludes that the question of whether an order is final—and thus within the scope of Rule 60(b)—turns on whether it is appealable. Only orders that are appealable will be considered final within Rule 60(b). Put differently, non-appealable orders are generally considered interlocutory, and therefore outside the scope of Rule 60(b):

> Because Rule 60(b) enumerates grounds for relief from a *"final* judgment, order or proceeding," the threshold question is whether [my previous order] is "final." Fed. R. Civ. P. 60(b) (emphasis added and capitalization altered). Contrary to the parties' assumption, [my previous order] is not "final" within the meaning of Rule 60(b).
>
> The prevailing rule in this Circuit and elsewhere is that an order is final for purposes of Rule 60(b) when it is appealable. "The standard test for whether a judgment is 'final' for Rule 60(b) purposes is . . . whether the judgment is sufficiently 'final' to be appealed." 12 James Wm. Moore et al., Moore's Federal Practice § 60.23 (cited in, inter alia, *Luv n' Care, Ltd. v. Regent Baby Prods. Corp.*, 986 F. Supp. 2d 400, 411 n.3 (S.D.N.Y. 2013), *reconsideration denied*, (S.D.N.Y. 2014); *Bank Leumi USA v. Ehrlich*, No. 12 Civ. 4423, Dkt. No. 58, at 2 (S.D.N.Y. Feb. 18, 2014); *Floyd v. City of New York*, 813 F. Supp. 2d 457, 464 n.65 (S.D.N.Y. 2011); *Alvarez v. Am. Airlines, Inc.*, No. 98 Civ. 1027, 2000 WL 145746, at *1 (S.D.N.Y. Feb. 8, 2000); *see also Gucci Am., Inc. v. Weixing Li*, No. 10 Civ. 4974, 2012 WL 1883352, at *2 (S.D.N.Y. May 18, 2012) (collecting cases), *vacated on other grounds*, 768 F.3d 122 (2d Cir. 2014). The Second Circuit has not expressly articulated this rule, but has adopted it by implication. *See In re U.S. Lines, Inc.*, 216 F.3d 228, 235 (2d Cir. 2000) (citing cases equating finality to appealability in finding district court's venue order in a bankruptcy case, which fell under district court's "original" rather

than "appellate" jurisdiction, as not final for Rule 60(b) purposes). At least three other circuits have stated that Rule 60 applies only to appealable final orders or judgments. *See Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 571 (7th Cir. 2006) ("Rule 60(b) of the Federal Rules of Civil Procedure . . . by its terms limited to 'final' judgments or orders, is inapplicable to interlocutory orders."); *Penn W. Assocs., Inc. v. Cohen*, 371 F.3d 118, 125 (3d Cir. 2004) (same); *Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*, 204 F.3d 867, 880 (9th Cir. 2000) (explaining that "a preliminary injunction is not a 'final judgment, order, or proceeding' that may be addressed by a motion under Rule 60(b)" because it is "interlocutory").

As is well established, for purposes of an appeal, "[a] final judgment or order is one that conclusively determines all pending claims of all the parties to the litigation, leaving nothing for the court to do but execute its decision." *Petrello v. White*, 533 F.3d 110, 113 (2d Cir.2008). The "core application" of the statute that confers appellate jurisdiction, 28 U.S.C. § 1291, "is to rulings that terminate an action." *Gelboim v. Bank of America Corp.*, 135 S.Ct. 897, 902 (2015). Barring a district court's entry of a partial final judgment based on an express determination that "there is no just reason for delay," "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties *does not end the action as to any of the claims or parties.*" Fed. R. Civ. P. 54(b) (emphasis added).

*In re Shengdate, Inc. Sec. Litig.*, No. 11-cv-1918, 2015 WL 3422096, at *3-4 (S.D.N.Y. May 28, 2015).

Here, it is clear that my May 19, 2015 order was not appealable. The order was thus interlocutory and not final within the meaning of Rule 60(b). Indeed, my order did not adjudicate all of the claims before me, and it did not dismiss any party from the litigation. Nor did I enter a partial final judgment or a determination that "there is no just reason for delay." *See id.*; *see also In re World Trade Center Disaster Site Litig.*, 521 F.3d 169, 178 (2d Cir. 2008) (describing what constitutes a final order). Thus, Rule 60(b) cannot provide the plaintiffs with relief.

Next for consideration is Rule 59(e). That Rule permits parties to file motions to "alter or amend a judgment." *See* Fed. R. Civ. P. 59(e). There is again a threshold question here: whether

my May 19, 2015 order granting partial summary judgment qualifies as "a judgment" within the scope of Rule 59(e). This question is not entirely settled. Some courts hold that summary judgment orders fall outside Rule 59(e) because, in general, Rule 59 addresses post-trial motions. *See, e.g.*, *Hill v. Bethlehem Steel Corp.*, 729 F. Supp. 1071, 1072 n.1 (E.D. Pa. 1989), *aff'd*, 902 F.2d 1560 (3d Cir. 1990). Other courts hold that Rule 59(e) applies to summary judgment orders because subsection (e) in particular does not limit itself to post-trial motions. *See, e.g.*, *Larry Spier, Inc. v. Bourne, Co.*, No. 90-cv-1065, 1991 WL 51146, at *1 (S.D.N.Y. Apr. 3, 1991) (considering motion to amend judgment under Rule 59(e) even though "there is some force to the suggestion" that motion for summary judgment "does not fall within the rule."); *Travelers Ins. Co. v. Buffalo Reins. Co.*, 739 F. Supp. 209, 210 (S.D.N.Y. 1990) (vacating summary judgment order upon Rule 59(e) motion).

Even assuming that my May 19, 2015 order of partial summary judgment falls within the scope of Rule 59(e), I still decline to grant reconsideration under that Rule. Courts impose an exacting 28-day time limit within which parties must file a motion under Rule 59(e). "A district court is not empowered to extend the time to file a Rule 59(e) motion." *Corines v. Am. Physicians Ins. Trust*, 615 Fed. App'x 708, 708 (2d Cir. 2015) (summary order). In fact, Rule 6(b)(2) expressly prohibits time extensions under Rule 59(e): "A court must not extend the time to act under" Rule 59(e). In this case, plaintiffs filed their motion roughly 1.5 years after my May 19, 2015 decision. Plaintiffs may not proceed under Rule 59(e).

Plaintiffs may nonetheless proceed under Rule 54(b), pursuant to which I have express authority to reconsider all interlocutory orders. *See United States v. LoRusso*, 695 F.2d 45, 53 (2d Cir. 1982) (addressing both civil and criminal cases and stating that "district court has the inherent power to reconsider and modify its interlocutory orders prior to the entry of judgment").

Rule 54(b) provides that an "order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and *may be revised at any time* before the entry of a judgment . . . ." Fed. R. Civ. P. 54(b) (emphasis added); *see also Parmar v. Jeetish Imports, Inc.*, 180 F.3d 401, 402 (2d Cir. 1999) ("All interlocutory orders remain subject to modification or adjustment prior to the entry of a final judgment adjudicating the claims to which they pertain."); *Kotlicky v. U.S. Fid. & Guar. Co.*, 817 F.2d 6, 9 (2d Cir. 1987) (indicating that all district court orders will be subject to modification and revision to the extent they are non-final, especially where an order was not relied upon by the parties); 11 Wright, Miller & Kane FEDERAL PRACTICE AND PROCEDURE § 2852, 292-93 (3d ed. 2012) ("[T]he power of a court to modify an interlocutory judgment or order at any time prior to final judgment remains unchanged and is not limited by the provisions of Rule 60(b).").

While a district court may revise decisions under Rule 54(b), it is not obligated to do so. Rather, the "law of the case doctrine" controls. According to this doctrine, a district court may reconsider prior adjudications where to do so would not be inconsistent with the objectives of efficiency and finality. *See Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992); *Tri-Star Pictures, Inc. v. Leisure Time Prod., B.V.*, 88-cv-9127, 1992 WL 296314, at *2 (S.D.N.Y. Oct. 6, 1992). In other words, the doctrine provides district courts with discretion to revisit earlier rulings "subject to the caveat that 'where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'" *Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003) (quoting *Zdanok v. Glidden Co.*, 327 F.2d 944, 953 (2d Cir. 1964)).

When considering a motion for reconsideration under Rule 54(b), "[t]he major grounds justifying reconsideration are 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *DiLauria v. Power Auth. of N.Y.*, 982 F.2d 73, 76 (2d Cir. 1992). For new evidence to justify reconsideration, the evidence must be "of such importance that it probably would have changed the outcome" of the prior ruling. *See United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 392 (2d Cir. 2001). "When newly discovered evidence is the basis for reconsideration, the proponent must demonstrate that the newly discovered evidence was neither in his possession nor available upon the exercise of reasonable diligence at the time the interlocutory decision was rendered." *See In re Rezulin Prod. Liab. Litig.*, 224 F.R.D. 346, 350 (S.D.N.Y. 2004) (collecting cases).

Applying this framework, numerous courts have reconsidered prior orders and decisions based on new evidence. *See, e.g.*, *J.C. Penney Corp., Inc. v. Carousel Center Co., L.P.*, No. 02-cv-1360, 2009 WL 3246794, at *3-4 (N.D.N.Y. Oct. 6, 2009) (granting motion for reconsideration); *Rockland Exposition, Inc. v. Alliance of Auto. Servs. Providers of New Jersey*, 894 F. Supp. 2d 288, 341 (S.D.N.Y. 2012) (reaching merits based on theory that pertinent discovery information was not unavailable at time of previous order); *Adams v. Ellis*, No. 09-cv-1329, 2012 WL 4762044, *6 (S.D.N.Y. Oct. 5, 2012) (reaching merits based on newly available declarations).

Defendant Schuman presents two primary arguments in opposing the plaintiffs' motion for reconsideration. First, Schuman asserts that the plaintiffs' motion is time-barred pursuant to Local Rule 6.3. That Rule provides 14 days during which to seek reconsideration following issuance of an order. Here Schuman states correctly that "[p]laintiffs filed this motion over 1.5 years after the Court issued its [May 19, 2015] ruling dismissing plaintiffs' [independent] failure

to warn claim." Def.'s Mem. Opp'n Pls.' Mot. for Reconsideration, at 8. Nevertheless, Schuman fails to address or even acknowledge the obvious issue: that the plaintiffs could not file for reconsideration until after they received the new evidence upon which they now rely.

Schuman's supplemental production in this case began around June 2016 and continued until at least September 12, 2016. *See, e.g.*, Supp. Resp. to Pls.' Post-Depo. Demands (dated Sept. 12, 2016). The plaintiffs now rely on the documents produced during that time. Moreover, the documents that Schuman provided during that time were of a technical nature virtually meaningless to an attorney without the help of a consulting expert—e.g., electronic schematics resembling blue prints, complete with engineering symbols and industry shorthand. *See generally id*. Considering all of this, it would be reasonable for the plaintiffs to take the month of September 2016 to evaluate the newly produced documents and consult an expert before taking the extreme measure of filing a motion for reconsideration. And this is precisely what the plaintiffs did. *See* Pls.' Reply Mem. Supp. Mot. for Reconsideration, Feb. 17, 2017, ECF No. 91, at 8.

At some point before October 6, 2016, the plaintiffs had contacted counsel for Schuman and shared their intention to file a motion for reconsideration. *See* Ltr., Allison Hendele, Oct. 6, 2016, ECF No. 74, at 2. Indeed, the plaintiffs sought to coordinate a motion and briefing schedule with Schuman in accordance with my bundling rule. But Schuman apparently refused to coordinate such a schedule without a "pre-motion conference" or "court order" that expressly "allowed" for the plaintiffs' motion. *Id.* Magistrate Judge Kuo thus issued an order addressing Schuman's position. She did so on October 7, 2016, holding that no pre-motion conference was necessary for the plaintiffs' motion. *See* Order, Minute Entry, Oct. 7, 2016. She further ordered that Schuman must coordinate a motion and briefing schedule in accordance with my bundling rule. *Id.* By

October 24, 2016 Schuman had finally agreed to a schedule. *See* Ltr., Gregory Cannata, Oct. 24, 2016, ECF No. 75. I then approved that schedule on November 1, 2016. *See* Order, Nov. 1, 2016.

In short, the plaintiffs exhibited diligence and prudence in pursuing their motion for reconsideration, especially in the face of opposition presented by Schuman. Accordingly, the proper time to examine is not the roughly 1.5 years between May 19, 2015 (the date of my initial order) and October 24, 2016 (the date when the plaintiffs formally filed their motion for reconsideration). Rather, the proper time period to consider would be the roughly 20 days between September 12, 2016 (the date that Schuman completed its discovery productions) and October 6, 2016 (the date by which Schuman had refused to coordinate a briefing schedule with the plaintiffs).

Measuring from this perspective, plaintiffs' motion was made within a reasonable period considering the plaintiffs' need to consult with an expert before taking the extreme measure of filing for reconsideration. I will not apply Local Rule 6.3 so rigidly as to prevent the plaintiffs' motion under these circumstances. *See Lechtenberg v. Besicorp Grp., Inc.*, 204 F.3d 397, 403-04 (2d Cir. 2000) (stating that an extension under Local Rule 6.3 is within district court's discretion and does not contravene Fed. R. Civ. P. 6(b)); *Libaire v. Kaplan*, No. 06-1500, 2010 WL 317893, at *4 (E.D.N.Y. Jan. 21, 200) (collecting cases).

Schuman next argues the plaintiffs' new evidence (the engineering folder and the alternative schematic) are "not Schuman document[s]." Therefore, Schuman argues, these documents cannot form the basis of a motion for reconsideration. Def.'s Mem. Opp'n Pls.' Mot. for Reconsideration, at 12. Indeed, Schuman argues that many of these documents came from the former S.K.S. facility and that Schuman's president was not aware of their existence until very recently. *See id.* at 11-12. Nevertheless, it is not dispositive whether Schuman "owned" these documents in the strictest sense. What is important is that the documents were under the sole

possession and control of Schuman and its employees during all pertinent times. *See* Fed. R. Civ.

P. 34(a)(1) (requiring parties to produce documents within their "possession, custody, or control");

*Matter of Marc Rich & Co., A.G.*, 707 F.2d 663, 667 (2d Cir. 1983) ("[t]he test for the production

of documents is control"); *see also UCAR Int'l, Inc. v. Union Carbide Corp.*, No. 00-cv-1338,

2004 WL 137073, at *13 (S.D.N.Y. Jan. 26, 2004) (collecting cases supporting the proposition

that "[k]nowledge and actions of a corporation's employees and agents are generally imputed to

the corporation where the acts are performed on behalf of the corporation and are within the scope

of their authority.")

Schuman refuses to acknowledge its role in failing to provide the plaintiffs with basic,

fundamental documents pertinent to this litigation and within the scope of discovery. Had

Schuman done so, there would be no need for the plaintiffs' motion for reconsideration. As set out

earlier, the plaintiffs requested in May 2014 all documents "prepared, received, or maintained" by

Schuman "related to the safety guards [or the operation] of the Model 60 Horizontal Wrapper."

*See* Pls.' Not. to Produce, May 28, 2014, at ¶¶ 14, 15. Schuman responded in August 2014 that

"none" such documents existed within its possession, custody, or control. *See* Schuman Supp.

Resp. Not. to Produce, Aug. 28, 2014, at ¶¶ 14, 15. And yet, responsive documents did exist—

apparently Schuman had simply not searched for them.

For instance, the engineering folder containing the one-page alternative schematic was

stored at all pertinent times at Schuman's facility, and Schuman employees were highly familiar

with the folder. *See, e.g.*, Schuman Aff., Jan. 18, 2017, at ¶ 15 (indicating that employee Sterner

was readily familiar with said documents). In addition to the one-page alternative design

schematic, the engineering folder in question contained sales records, client contact information,

and more, all related to the Model 60. *See, e.g.*, Second Sterner Depo. 153:21-155:5. It clearly fell

within the scope of discovery. Schuman could have and should have discovered the engineering folder and produced it upon the plaintiffs' May 2014 document request. Schuman's president implies in an affidavit filed with the court that he never asked his employees (or at least not his employees most knowledgeable about these matters) to search for responsive documents until as late as June or July 2016. *See* Schuman Aff., Jan. 18, 2017, at ¶ 15. In fact, his affidavit does not indicate whether Schuman undertook any actions at all to search for documents following the plaintiffs' May 2014 request for production. *See generally id.*

Moreover, not only did Schuman apparently fail to search adequately for responsive documents, it also neglected to correct that failure when, during a deposition in September 2014, Schuman should have realized that previously unproduced responsive documents existed at the Schuman facility. *See* O'Shea Depo. 60:13-66:11. Again, a long-time Schuman employee was being deposed. *See id.* at 14:4-11. As the employee began to describe the engineering folder in question, plaintiffs' counsel demanded the folder from Schuman's counsel, on the record. *Id.* at 60:13-66:11. Both Schuman's president and Schuman's counsel were present at the deposition. Both agreed they would search for and preserve the documents and produce them. *Id.* Yet they failed to comply for roughly two years.

Indeed, it was Schuman's duty in the first instance to conduct a proper search for pertinent documents—and also its responsibility to continually supplement its previous discovery responses as additional documentation became known and available. Schuman failed to do this. *See Catskill Dev., LLC v. Park Place Entm't Corp.*, 286 F. Supp. 2d 309, 314-15 (S.D.N.Y. 2003) (citing numerous cases and stating that even an accidental failure to produce documents requested in discovery may constitute party misconduct for purposes of relief from an order under Rule 60(b)(3)); *Nkihtaqmikon v. BIA*, 601 F. Supp. 2d 337, 340 (D. Maine 2009) (documents previously

withheld during discovery constituted new evidence for purposes of Rule 60(b)(2)); *Nycomed U.S. Inc. v. Glenmark Generics Ltd.*, No. 08-cv-5023, 2010 WL 3173785, at *4 (E.D.N.Y. Aug. 11, 2010) (imposing sanctions for belated discovery production and failure to conduct adequate search for responsive material); *Metropolitan Opera Ass'n, Inc. v. Local 100*, 212 F.D.R. 178, 221-22 (S.D.N.Y. 2003) (plaintiff entitled to judgment on question of liability because defendant conducted inadequate search for responsive documents and acted without real concern for obligations under discovery rules).

### B. Merits

I turn now to reconsider the merits of Schuman's motion for summary judgment regarding the independent failure to warn claim. A motion for summary judgment will be denied unless there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining whether a genuine factual issue exists, the court draws all reasonable inferences and construes all evidence in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

I have previously held—and the parties do not dispute—that New York law governs the independent failure to warn claim. *See Celle v. Filipino Reporter Enter. Inc.*, 209 F.3d 163, 175 (2d Cir. 2000) ("Since no party has challenged the choice of New York libel law, all are deemed to have consented to its application."). In general, a failure to warn claim requires a showing of four elements: "(1) the manufacturer had a duty to warn; (2) the manufacturer breached such duty so that the product is rendered defective, i.e. reasonably certain to be dangerous; (3) the defect was the proximate cause of the plaintiff's injury; and (4) that the plaintiff suffered loss or damage." *Bah v. Nordson Corp.*, No. Civ. 9060 DAB, 2005 WL 1813023, at *13 (S.D.N.Y. Aug. 1, 2005)

(collecting cases). In the present case, there is no dispute that the plaintiff Vicuna suffered cognizable damages. I therefore turn to the first three elements.

### 1. *Duty to Warn*

A corporation that is a successor to an original manufacturer will have an independent duty to warn purchasers of a product manufactured by the corporation's predecessor where there is a "special relationship" between the successor and the purchaser. *Sullivan v. Joy Mfg. Co.*, 70 N.Y.2d 806, 808 (1987); *Schumacher v. Richards Shear Co., Inc.*, 59 N.Y.2d 239, 246 (1983). The question of what constitutes a special relationship in this context is not entirely settled in New York. Rulings turn on the unique facts presented in each case.

Interestingly, the question of whether a special relationship exists is, in New York, virtually always a question of law for the court. *McCarthy v. Olin Corp.*, 119 F.3d 148, 156 (2d Cir. 1997). Yet within the unique context of a successor corporation's independent duty to warn, the question is one of fact reserved for the jury. *Schumacher*, 59 N.Y.2d at 248-49. While I have discovered no in-depth commentary discussing this subtle inconsistency, I observe that Judge Jones of the New York Court of Appeals took note of it. In discussing a successor corporation's independent duty to warn, he wrote: "Evidently, whether in a particular instance the factual aspects of the relationship between the servicer and the owner are such as to give rise to liability of the servicer is a question for determination by the jury, subject, of course, to the obligation of the court to take the question from the jury if the evidence would be insufficient as a matter of law to sustain a verdict for the plaintiff." *Id.* at 258 (Jones, J., dissenting).

The leading case outlining what constitutes a special relationship in an independent duty to warn claim is *Schumacher*. It holds that "[s]everal factors may be considered in determining whether there exists a sufficient link to create a duty to warn, among them 'succession to a

predecessor's service contracts, coverage of the particular machine under a service contract, service of that machine by the purchaser corporation, and a purchaser corporation's knowledge of defects and of the location or owner of that machine.'" *Schumacher*, 59 N.Y.2d at 247. The Court of Appeals in *Schumacher* ultimately held that evidence had been presented to defeat a successor corporation's motion for summary judgment. *See id.* at 249. Indeed, the successor there knew the location and owner of the machine, actively offered to service the machine, and the successor held itself out as having expertise in the product. *Id.*

A question of fact for the jury also existed in *Colon v. Multi-Pak Corp.*, 477 F. Supp. 2d 620, 625-28 (S.D.N.Y. 2007). In *Colon*, the successor corporation provided service to plaintiff's employer, there had been "subsequent business contacts" between the successor and the employer, and there may have been a service contract between the successor and the employer. *See id.* Similarly, the court in *Radziuk v. Hooper, Inc.* applied the *Schumacher* factors and denied a successor corporation's motion for summary judgment. 479 N.Y.S.2d 324, 328 (Sup. Ct. Monroe Cnty. 1984). *Radziuk* presents an important articulation of the law for our purposes. The record in *Radziuk* indicated that the successor corporation had substantial points of contact with the owner of the machine in question. *Id.* at 325. This contact included on-site machine operation training as well as ongoing service and maintenance of the machine in question. *Id.* at 325-26. In addition, the successor company actually developed a "safety kit" for the machine model in question and requested that its consultant publish a safety "bulletin" regarding the model. *Id.* at 325. Significantly, the safety bulletin included an alternative design that added safety guards to the machine—safety guards that would have prevented the underlying injury in the litigation. *Id.* The court considered all of these facts in its analysis but focused particularly on the alternative design. In concluding that a reasonable jury could find a special relationship, the court emphasized not

only that the alternative design was announced in a bulletin but also that the successor corporation, in continuing its manufacturing of the product line in question, had incorporated a similar alternative design into its newer models. *Id.* at 327.

In contrast to these cases, the New York Court of Appeals held in *Sullivan* that a special relationship is not established when a successor corporation makes only a single service call to a plaintiff's employer. 70 N.Y.2d at 808-09. The Appellate Division echoed this reasoning in *Goldman v. Packaging Indus., Inc.*, 534 N.Y.2d 388, 391-92 (N.Y. App. Div. 1988). There, the court held that a successor corporation had no duty to warn where the successor made only a single service call to plaintiff's employer, there was no service contract, the successor attempted to avoid servicing such machines, and there were no systematic contacts between the successor and employer. *Id.* Last, in *Peralta v. WHM Tool Grp., Inc.*, the court held that no special relationship existed, where none of the *Schumacher* factors were present. *See* No. 04-cv3826, 2005 WL 2002454, at *5 (E.D.N.Y. Aug. 19, 2005). In reaching its decision the court specifically noted that "there is no evidence that [the successor] knew or had reason to know of any defects in the machine." *Id.*

Taking all this into account, I conclude that the plaintiffs have put forth sufficient evidence to defeat Schuman's motion for summary judgment on the independent duty to warn claim. There is no dispute that Schuman provided plaintiff's employer with an operator's manual as well as spare parts for the machine underlying this litigation. As I held previously, this alone would not be sufficient to trigger Schuman's duty to warn. *See* Mem. & Order, May 19, 2015, at 18. Indeed, the one-time supply of a manual and spare parts is similar to a single service call, which, under *Sullivan*, is not enough to trigger an independent duty to warn. 70 N.Y.2d at 808-09. But now we

understand that further factors existed suggestive of a special relationship between Schuman and plaintiff's employer.

That is, it appears that Schuman knew of an alternative design for the Model 60. Again, Schuman's employees were familiar with the engineering folder that was transported from the S.K.S. facility to the Schuman facility. *See* O'Shea Depo. 23:11-22; 27:2-5; 27:21-28:9; 53:6-15; 60:18-21; 61:2-12; First Sterner Depo. 16:1-8; 36:12-17; 44:10-13; Def.'s Mem. Opp'n Pls.' Mot. for Reconsideration, at 6. That folder contained a one-page alternative design schematic. *See* Resp. to Pls.' Supp. Not. to Produce, at 4. As in *Radziuk*, implementation of that alternative design at plaintiff's place of employment would have prevented the underlying injury in this litigation. *Radziuk*, 479 N.Y.S.2d at 325. What is more, while Schuman did not continue manufacturing Model 60s, it did continue manufacturing the AmeriPak line of horizontal wrappers—i.e., Models 40 and 140. In doing so, Schuman itself incorporated an alternative design similar (or even identical) to that seen in the engineering folder taken from the S.K.S. facility—this is again similar to the *Radziuk* case. *See id.* at 327.

I emphasize that I cannot ignore Schuman's knowledge or constructive knowledge of the alternative design for the Model 60 in determining Schuman's independent duty to warn plaintiff or her employer. New York's *Schumacher* factors expressly contemplate "a purchaser corporation's knowledge of defects and of the location or owner of that machine." *Schumacher*, 59 N.Y.2d at 247. The record is clear that Schuman knew the location and the owner of the machine underlying this litigation. *See* Operator's Manual, at 2. Moreover, a jury could readily find that Schuman had or should have had knowledge of a defect. *See, e.g.*, Resp. to Pls.' Supp. Not. to Produce, at 4; Eng'g Report, at 11; *see UCAR Int'l, Inc. v. Union Carbide Corp.*, No. 00-cv-1338, 2004 WL 137073, at *13 (S.D.N.Y. Jan. 26, 2004) (stating that employees' knowledge of facts is

generally imputed to corporation). Indeed, Schuman itself made changes to its AmeriPak wrappers in order to correct the exact defect underlying this litigation. *See, e.g.*, Eng'g Report, at 18.

Furthermore, this case is not like the *Goldman* case described above. 534 N.Y.2d at 391-92. There, the successor actively sought to avoid business dealings with the machine underlying that litigation. *Id.* In the present case, however, Schuman was eager to present itself as an expert in the Model 60 and as a company upon which plaintiff's employer could rely for its needs relating to the Model 60. While Schuman did not draft the Model 60 operator's manual, it did personalize the cover page of that manual, choosing to denote AmeriPak as "a division of O.P. Schuman and Sons, Inc." *See* Operator's Manual, at 1. Schuman additionally personalized the second page of the operator's manual, choosing, for solicitation purposes, to provide the names and contact information for its sales department. *Id.* at 2.

Given these circumstances, the trier of fact must decide for itself whether Schuman had an independent duty to warn. These circumstances include Schuman's sale of an operator's manual and spare parts to plaintiff's employer; Schuman denoting AmeriPak as a "division of" Schuman in the operator's manual; Schuman inserting its sales department's contact information into the operator's manual for solicitation purposes; Schuman's knowledge of the location and the owner of the machine in question; Schuman's knowledge or constructive knowledge of the one-page alternative design schematic; and Schuman's actual implementation of a similar or identical alternative design into its newer models. My holding here is especially appropriate where the New York Court of Appeals broke with its own tradition in 1983 and categorized questions regarding a successor corporation's independent duty to warn as an issue of fact for the jury, not an issue of law for the court—as I outlined earlier.

*2. <u>Breach of Duty</u>*

"The adequacy of the warning in a products liability case based on a failure to warn is, in all but the most unusual circumstances, a question of fact to be determined at trial." *Cooley v. Carter-Wallace Inc.*, 102 A.D.2d 642, 642 (N.Y. App. Div. 4th Dep't); *see Billiar v. Minn. Mining and Mfg. Co.*, 623 F.2d 240, 247 (2d Cir. 1980). Indeed, "recovery [under a failure to warn theory] ultimately depends upon a subjective determination by the trier of facts of what constitutes reasonable warning under all the circumstances." *Rainbow v. Albert Elia Bldg. Co.*, 49 A.D.2d 250, 253 (N.Y. App. Div. 4th Dep't 1975). While this area of law is not replete with bright-line rules, one clear principle is that the need for specific warnings increases as the risk posed by a machine increases. *See Cover v. Cohen*, 61 N.Y.2d 261, 275 (1984); *Lancaster Silo & Block Co. v. Carter-Wallace, Inc.*, 75 A.D.2d 55, 65 (N.Y. App. Div. 4th Dep't 1980).

Schuman's briefing does not appear to directly address plaintiffs' two major assertions on this issue. First, plaintiffs assert that Schuman should have added to its operator's manual the one-page insert providing the alternative design schematic described earlier. Pls.' Mem. Supp. Mot. for Reconsideration, at 22. This design schematic would have alerted plaintiff's employer as to the danger of operating the machine in manual mode and, more importantly, provided a simple and inexpensive electronic workaround to fix the defect in question. Schuman was already in the practice of customizing the first two pages of the Model 60 operator's manual. *See* Operator's Manual, at 1-2. Adding an additional one-page insert would not have burdened Schuman. Moreover, such an inexpensive warning from Schuman seems particularly appropriate here given the severity of the risk that the Model 60 posed—amputation or potentially worse. *See Cover*, 61 N.Y.2d at 275; *Lancaster*, 75 A.D.2d at 55.

Second, plaintiffs maintain that Schuman could have equipped the machine in question with properly situated decals. These decals might have, for example, alerted the operator that he or she should use the machine only with the protective guard in place; that the operator should not operate the machine in manual mode; or that the operator should wear heat-resistant gloves when operating the machine. Pls.' Mem. Opp'n Def.'s 1st Mot. Summ. J., at 39-40. While the record indicates that a decal was present on the Model 60 around the time of plaintiff Vicuna's accident, it is not clear what that decal portrayed. *See* Photograph AmeriPak Model 60, at 1. Moreover, whatever the decal portrayed, it was positioned such that it could not be seen when the interlocking guard was vertical and unsecured. *See id.* I observe that the plaintiff has testified that she did not recall a warning decal present on the day of her accident. First Vicuna Depo. 49:12-17. A jury could reasonably find that Schuman breached its duty warn.

3. <u>*Proximate Cause*</u>

New York law imposes a "presumption that a user would have heeded warnings if they had been provided, and that the injury would not have occurred." *Anderson v. Hedstrom*, 76 F. Supp. 2d 422, 441 (S.D.N.Y. 1999); *see also Liriano v. Hobart Corp.*, 170 F.3d 264, 271-72 (2d Cir. 1999) (*Liriano II*) ("[R]ather than requiring the plaintiff to bring in more evidence to demonstrate that his [or her] case is of the ordinary kind, the law presumes normality, and requires the defendant to adduce evidence that the case is an exception. . . . This shifting of the onus procedendi has long been established in New York.").

A reasonable jury could find proximate cause on the record provided. The plaintiff Vicuna has testified specifically that, had she be warned of the dangers present, she would not have operated the machine in the manner that she did. First Vicuna Depo. 49:18-50:19; 53:8-14. Moreover, common sense indicates that the injury in question could have been avoided had

Schuman provided a proper warning or alternative schematic. Indeed, decals present on the machine could have alerted the plaintiff to the dangers of the machine as well as alternative operation methods available to ensure safety, such as protective gloves. Additionally, I highlight that plaintiff's employer specifically requested an operator's manual from Schuman. *See* Manual Invoice, Jan. 5, 2012, ECF No. 49-12. Plaintiff's employer did this arguably for the purpose of maintaining and operating the machine in a safe and efficient manner. Had Schuman provided the one-page alternative schematic with the operating manual, it is possible that plaintiff's employer would have made use of it—and prevented the injury here. I therefore deny Schuman's motion for summary judgment on the independent duty to warn claim.

## II.     Defendant's Motion to Preclude Plaintiffs' Proffered Expert

Schuman moves to preclude the plaintiffs' proffered expert, Mr. Eric Heiberg. First, Schuman asserts that Mr. Heiberg is unqualified as an expert and, therefore, he cannot provide any testimony at all in this matter. Second, Schuman argues that, even if qualified as an expert, Mr. Heiberg's proffered testimony is so unreliable as to render it inadmissible.

### A.  Qualification

A district court exercises broad discretion in deciding whether to exclude expert testimony. *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042 (2d Cir. 1995). Rule 702 of the Federal Rules of Evidence sets out the standard for admissibility:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> **(b)** the testimony is based on sufficient facts or data;
> **(c)** the testimony is the product of reliable principles and methods; and

> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The threshold question under Rule 702 is whether a witness is qualified to render expert testimony. This involves a two-part inquiry:

> [T]he court must first ascertain whether the proffered expert has the educational background or training in a relevant field. Then the court should further compare the expert's area of expertise with the particular opinion the expert seeks to offer and permit the expert to testify only if the expert's particular expertise enables the expert to give an opinion that is capable of assisting the trier of fact.

*TC Sys. Inc. v. Town of Colonie*, 213 F. Supp. 2d 171, 174 (N.D.N.Y. 2002) (collecting cases).

In assessing an expert's qualifications, the witness "should not be required to satisfy an overly narrow test of his own qualifications, and the court's focus should be on whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth." *Crown Cork & Seal Co., Inc. Master Ret. Trust v. Credit Suisse Boston Corp.*, No. 12-cv-05803, 2013 WL 978980, at *2 (S.D.N.Y. March 12, 2013) (internal marks and citations omitted). "Disputes as to the strength of [an expert's] credentials, faults in his use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." *McCullock*, 61 F.3d at 1044.

It is apparent here that the plaintiffs' proffered expert in this case, Mr. Heiberg, has an impressive background that is germane to the matter at hand. He attended The Cooper Union for the Advancement of Science and Art on a full merit-based scholarship. *See* Eric Heiberg, Curriculum Vitae, July 29, 2016, ECF No. 94-14, at 30. He graduated in 1986 with a B.S. in mechanical engineering. *Id.* At Cooper Union, Mr. Heiberg completed more than two dozen advanced seminars, including a seminar titled "OSHA: Machine Safeguarding – Machine Guarding." *Id.* at 30-31. Due to his academic achievements, he was inducted into the *Pi Tau Sigma* National Honor Society for Mechanical Engineers. *Id.* at 30.

Mr. Heiberg's work experience now spans over thirty years. Yes, some of his professional activities may not apply directly to this litigation—e.g., senior building inspector at Stuyvesant Town/Peter Cooper Village. *See id.* at 30; *but see Lara v. Delta Int'l Mach. Corp.*, 174 F. Supp. 3d 719, 730-33 (E.D.N.Y. 2016) (holding that expert qualified to testify as to machine safeguards even where his practical background was in building safety). Nevertheless, much of Mr. Heiberg's experience is directly applicable. For instance, Mr. Heiberg worked as the manager of engineering at a company known as EBI. *See* Eric Heiberg, Curriculum Vitae, at 29. His primary duties were to design, produce, and test medical equipment. This brought him into contact with various machines similar in nature to the Model 60 in question here. *See id.* at 29, 32. Other responsibilities at EBI included hazard and risk analyses, product labeling, warning labeling, operator manual drafting, workplace safety supervision, and more. *Id.* at 29. In another position, as a mechanical engineer at Coltene/Whaledent, Mr. Heiberg oversaw the design and production of numerous plastic products. *Id.* He was additionally responsible for the selection and purchasing of workplace safety equipment; further duties included supervision regarding regulatory workplace safety requirements. *Id.*

Mr. Heiberg has worked first-hand with numerous machines relevant to the events underlying this litigation, including heating machines, packaging machines, crimping machines, punch presses, brake presses, shrink wrapping machines, heat processing machines, mixing machinery, and more. *Id.* at 35. Again, Mr. Heiberg's education specifically included training on machine guarding, which goes to the heart of this litigation. *Id.* at 30-31. He is currently a registered professional engineer in four states, including New York and Pennsylvania. *Id.* at 30. He is also a member of the American Society of Mechanical Engineers and the American Society of Civil Engineers. *Id.* at 31.

It is unreasonable to claim that Mr. Heiberg could not at least *assist* the trier of fact in a litigation such as this. Indeed, in arguing that Mr. Heiberg is unqualified to render an expert opinion, Schuman conflates admissibility with evidentiary weight. Schuman points out that Mr. Heiberg has never previously worked directly with an AmeriPak Model 60. See Def.'s Mem. Supp. Mot. to Exclude Expert, Dec. 9, 2016, ECF No. 94, at 7. This is precisely the type of fact that goes to the weight of Mr. Heiberg's testimony, and not his threshold qualification to testify. It would be immensely difficult (if not impossible) to locate and retain an expert who has worked first-hand with an AmeriPak Model 60—a machine that has been out of production for nearly 15 years.

This is not unlike Schuman's other contention: that Mr. Heiberg is unqualified because he has never previously provided testimony *at trial* as an expert in a litigation involving *packaging equipment specifically*. *Id.* at 8. If that alone were sufficient to preclude Mr. Heiberg, all courts would be devoid of expert witnesses—there must be a first time for everything. At any rate, I observe that clients have retained Mr. Heiberg as an expert in thirty-six different projects involving machines with interlocking guards similar to the guard at issue in the present case. *See* Eric Heiberg, Retained Cases, Jan. 20, 2017, ECF No. 98-10, at 7-8. Of those thirty-six projects involving interlocking guards, fourteen progressed to formal litigation, including cases in state and federal courts in New York and New Jersey. *Id.* Moreover, of the thirty-six projects involving interlocking guards, approximately ten involved packaging equipment specifically (though apparently none of those ten projects progressed to formal litigation). *Id.* At any rate, Mr. Heiberg is no stranger to the courtroom: in the past five years alone, he has appeared in person at court proceedings in at least ten litigations. *See* Eric Heiberg, List of PE Court Appearances, July 18, 2016, ECF No. 94-14, at 35.

Schuman's case citations here do not support its position. Schuman cites *Sorto-Romero v. Delta Int'l Mach. Corp.* for the proposition that Mr. Heiberg should be disqualified as an expert. *See* No. 05-cv-5172, 2007 WL 2816191, at *4-5 (E.D.N.Y. Sept. 24, 2007). Yet the *Sorto-Romero* decision did not address expert qualification. Rather, it addressed the *reliability* of expert testimony, a completely different matter. Indeed, the court in *Sorto-Romero* wrote expressly that the parties had conceded that the proffered expert there "possesse[d] the requisite knowledge and experience to be qualified as an expert." *Id.* at *4. Schuman also cites *Barban v. Rheen Textile Sys., Inc.*, No. 01-cv-8475, 2005 WL 387660, at *3 (E.D.N.Y. Feb. 11, 2005). But that case involved a proffered expert that worked only part-time as an engineer, spending the majority of his time in real-estate development and personal investing. *Id.* That is not the case here. Moreover, the proffered expert in *Barban* had no previous experience designing, using, or inspecting the type of machine in question, nor any similar machine. *Id.* Again, that is not the case here. Mr. Heiberg is qualified.

### B. Relevance & Reliability

After qualifying a witness as an expert, the court must next turn to the other factors in Rule 702. The court is charged with "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). Regarding relevance, Rule 401 shapes the question facing the court: whether the proffered expert testimony has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Campbell v. Metropolitan Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001) (discussing how admissibility under Rule 702 interacts with Rule 401).

The reliability question is more involved. On this question, the *Daubert* standard has replaced the former *Frye* rule. *Frye* demanded that a scientific theory be generally accepted in the scientific community in order to be admissible. *See Daubert*, 509 U.S. at 585-89. Today's *Daubert* test is far less rigid than the old *Frye* rule. While Rule 702 "sets forth specific criteria for the district court's consideration, the *Daubert* inquiry is fluid and will necessarily vary from case to case." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).

Under *Daubert*, courts may consider any number of indicators when determining reliability. These include: (1) whether an expert's theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review; (3) a technique's known or potential rate of error; (4) the existence of standards controlling the technique's operation; and (5) whether a technique or theory has gained general acceptance in the relevant scientific community. These factors merely provide a backdrop and are not meant to constitute a "checklist." *Daubert*, 509 U.S. at 593; *Kumho Tire Co. Ltd v. Carmichael*, 526 U.S. 137, 141, 150 (1999). To be clear, an expert need not "back his or her opinion with published studies that unequivocally support his or her conclusions." *Amorgianos*, 303 F.3d at 267. In fact, an expert need not point to any literature at all to support his or her conclusions. *Id.* Rather, the point of *Daubert* and Rule 702 is merely to ensure that "junk science" does not enter the courtroom. *Id.* Like other Federal Rules of Evidence, courts must interpret Rule 702 liberally in favor of admission of proffered expert testimony. *See Daubert*, 509 U.S. at 588.

It is helpful to review the nature of Mr. Heiberg's investigation before addressing Schuman's specific objections. Mr. Heiberg's proffered report filed with the court is roughly twenty-five pages in length, single-spaced. *See generally* Eng'g Report. In that report, Mr. Heiberg outlines the information he reviewed in conducting his investigation. *Id.* at 2. This included two

site visits with the Model 60 machine in question, one in December 2012 and another in February 2016. *Id.* Additionally, Mr. Heiberg examined numerous photographs of the machine. *Id.* He also studied the operator's manual for the Model 60 as well as the manuals for subsequent machines in the AmeriPak line—e.g., Models 40 and 140. *Id.* Moreover, he read the transcripts from seven depositions, including the deposition of the plaintiff Vicuna and the depositions of several Schuman employees. *Id.* Mr. Heiberg further studied the one-page alternative electronic schematic dating from around 1995-1996. *See id.*

In addition to reviewing this evidence, Mr. Heiberg further consulted a plethora of safety regulations and protocols. This included, among other things: (1) Accident Prevention Manual, National Safety Council, Administration and Programs; (2) Product Safety Management Guidelines, National Safety Council; (3) American National Standard for Packaging-Related Converting Machinery – Safety Requirements for Construction, Care and Use; (4) The Measure of Man, Human Factors in Design, Henry Dreyfus; (5) Handbook of Warnings, Michael S. Wogalter; and (6) American National Standard for Product Safety, Signs and Labels. *See generally id.* Notwithstanding Mr. Heiberg's thorough investigation and research, Schuman argues that "Mr. Heiberg's opinion is unreliable as it was developed solely for the purpose of paid expert testimony." *See* Def.'s Mem. Supp. Exclusion Expert Witness, at 13. Yet this issue merely weighs against the credibility of Mr. Heiberg's testimony. It does not speak to admissibility. Countless experts develop opinions "solely for the purpose of paid testimony," and such is not a proper basis for exclusion. Indeed, the cases that Schuman cites here are altogether inapposite. *See, e.g.*, *In re Parmalat Sec. Litig.*, 477 F. Supp. 2d 637, 640-41 (S.D.N.Y. 2007) (addressing whether Italian accounting report drafted for purposes of foreign criminal proceeding was admissible under Fed. R. Evid. 803(8) public records hearsay exception).

Next, Schuman asserts that Mr. Heiberg's testimony is unreliable because he did not "consider alternative designs." Def.'s Mem. Supp. Exclusion Expert Witness, at 10. In making this argument, Schuman stresses in its brief that Mr. Heiberg "conceded that he has 'not looked at a safer alternative design for the automatic mode setting of this machine.'" *Id.* This is a peculiar "concession" for Schuman to highlight because the issue in this litigation involves use of the Model 60 in *manual* mode, not automatic. Schuman does not explain how an alternative design for automatic mode would be relevant.

Moreover, regarding manual mode, Mr. Heiberg did consider alternative designs in his written report. Based on Schuman's briefing, I would surmise that Schuman simply did not read Mr. Heiberg's report in its entirety. The report could not be more clear in setting out alternative designs, including analyses of feasibility, cost, and utility—the so-called "touchstones" of expert reporting in products liability cases. *See Barban v. Rheem Textile Sys., Inc.*, No. 01-cv-8475, 2005 WL 387660, at *5 (E.D.N.Y. Feb 11, 2005) (collecting cases). Indeed, Mr. Heiberg's report allocated five pages to a discussion of two different alterative designs. In discussing how the Model 60 could have been rewired to prevent operation in manual mode without proper guarding, Mr. Heiberg writes:

> A guard should have been provided where the machine was prevented from running while the infeed (fin seal) guard was in the vertical position, regardless of whether the machines was in manual or automatic mode. Such a guard could have been provided by splitting the electrical path downstream, not upstream of the guard micro-switches and NOT bypassing the micro-switches when the machine was in manual mode. In this design in order for the electricity to get to the "Main Drive" it has to pass through the micro-switch, and if the micro-switch opens (turns off) the electricity will cease to flow and the motor will stop. In such a design, the infeed (fin seal) guard would be required to be in the down, protecting position, during manual mode, in order for the machine to operate.

Eng'g Report, at 10-11.

Put simply, Mr. Heiberg's proposed alternative rewiring design would deprive the machine's conveyer mechanism of electricity in manual mode whenever the machine's protective guard was unsecured. This would apparently be similar to how a microwave oven will not activate unless its door is securely closed. In additional, it would also be similar to how the Model 60 operates in automatic mode, and similar to the one-page alternative design schematic created by S.K.S. in or around 1995-1996. *Id.* at 10. Importantly, the alternative rewiring design explored by Mr. Heiberg is a design similar or identical to that actually utilized in AmeriPak models that Schuman has manufactured subsequent to the Model 60, such as the Models 40 and 140. *See id.*

Mr. Heiberg's proposed alternative rewiring design, if incorporated into the Model 60, would have prevented the injuries underlying this litigation. Moreover, the favorable feasibility, low cost, and continuing utility of the alternative design have been analyzed here by Mr. Heiberg. *Id.* at 11, 17. Again, quite persuasive is that subsequent machines that Schuman manufactured incorporate an alternative rewiring similar to Mr. Heiberg's and seemingly function without any handicap. *See Almonte v. Averna Vision & Robotics, Inc.*, 128 F. Supp. 3d 729, 751 (W.D.N.Y. 2015) (holding that "the existence of a feasible alternative design may be established by pointing to the existence of a post-accident design").

I further observe that, in addition to the alternative rewiring design, Mr. Heiberg proposed moving the "start" button on the Model 60. *See* Eng'g Report, at 15. Moving the start button as Mr. Heiberg proposes would prevent many operators from using the Model 60 in manual mode while his or her hand was near the dangerous "pinch point." *See id.* Indeed, to use the Model 60's conveyor belt and pinching movement in manual mode, the operator must continually depress the machine's start button. *See* Operator's Manual, at 1-9. Under the original design of the Model 60,

the start button is located relatively close to the pinch point. *See* Photograph AmeriPak Model 60, Dec. 4, 2012, ECF No. 98-2, at 1. For this reason, many operators can easily depress the start button while stretching to reach their hand into the pinch point area (which is what happened in this case). This creates a moving hazard near the operator's outreached hand. Mr. Heiberg's start button redesign would place that button father away from the pinch point. *See* Eng'g Report, at 15. Under this redesign, many operators (over 97% of all females, for instance) could not depress the start button and simultaneously stretch to reach their hand into the pinch point area. *Id.* In other words, an operator would be less likely to lose his or her fingers in manual mode. Like his alternative rewiring design, Mr. Heiberg's alternative start-button design is complete with a feasibility, cost, and utility analysis. *See id.* It cannot be argued that Mr. Heiberg did not consider alternative designs.

Third, Schuman argues that Mr. Heiberg's testimony is unreliable because he did not consider plaintiff Vicuna's own misuse of the machine in question—that is, her choice to operate the Model 60 in manual mode contrary to the operator's manual. *See* Def.'s Mem. Supp. Mot. Preclude Expert, at 9-10. Mr. Heiberg, Schuman argues, also failed to consider the training from her employer that the plaintiff received, in which Vicuna was apparently directed to operate the machine in manual mode. *Id.* Again, I would surmise that Schuman has not read Mr. Heiberg's written report. There, Mr. Heiberg acknowledges that the plaintiff chose to operate the Model 60 in manual mode with the guard unsecured. Nevertheless, Mr. Heiberg's report determines that her use was foreseeable. *See* Eng'g Report, at 7; *see also Boots v. Stanley Black & Decker, Inc.*, 132 F. Supp. 3d 307, 314 (N.D.N.Y. 2015) (holding that foreseeable use of a product must be considered reasonable).

On this point, Mr. Heiberg quotes deposition testimony of Mr. Sterner, who was a principal engineer at S.K.S. and later an employee at Schuman. Mr. Sterner's testimony indicates that the plaintiff's use of the machine was expected at the time of the Model 60 design:

> Q. Did it occur to you when the machine was designed that the machine may be operated in the manual mode by an operator?
> A. Yes.
> Q. And was it – did you consider the fact that the guard could be raised during that operation in the manual mode and the machine would function?
> A. Yes.
> Q. And did you consider that it might bypass the safety of the – of the point of operation guard by an operator doing that?
> A. Yes.

*See* Eng'g Report, at 7. Moreover, Mr. Heiberg's report reveals that the operator's manual for the Model 60 contemplates at least some use of the machine in manual mode. *Id.* For instance, the operator's manual contemplates "jogging" the Model 60 in manual mode as well as using manual mode for machine "setup." Operator's Manual, at 1-9. This further indicates foreseeability. Mr. Heiberg properly considered the plaintiff's use of the Model 60.

Last, Schuman argues that Mr. Heiberg's testimony is unreliable because of his bias and predisposition towards finding in the plaintiffs' favor. Schuman emphasizes that Mr. Heiberg stated in his deposition, "If [the plaintiff] were to have intentionally stuck her arm into the machine and still injured it, it would not have been relevant to whether or not the machine was defective— defectively designed in a manner that caused the accident." Eric Heiberg Depo., Sept. 8, 2016, ECF No. 94-15, 111:12-18. Some case law would suggest that such an extreme position might warrant exclusion of an expert's testimony. *See, e.g.*, *Lara v. Delta Int'l Mach. Corp.*, 174 F. Supp. 3d 719, 738 (E.D.N.Y. 2016) (suggesting that unwavering predisposition towards finding fault in a product's design could render an expert opinion unreliable).

Yet Schuman has unfairly characterized Mr. Heiberg's position. Reading his deposition transcript in full, it is clear that Mr. Heiberg made a subtler point. *See* Eric Heiberg Depo. 110:1-116:20. Rather than suggest that an operator's actions could never be the cause of an accident on the Model 60, Mr. Heiberg merely stated that, in this case, it was the design of the Model 60 that contributed, at least in large part, to the injuries ultimately sustained. *Id.* at 113:5-20. In fact, during the course of clarifying his answer, Mr. Heiberg readily conceded that "there may have been other causes to the incident" in this case. *Id.* at 13-14. I further observe that the portion of Mr. Heiberg's testimony upon which Schuman relies was a point of real confusion between Mr. Heiberg and the attorneys present at his disposition. The attorney representing Muffins 'n' More actually "moved to strike" Mr. Heiberg's statement because he did not "think that [it] answered the question" being asked. *Id.* at 111:19-21. Whatever the case with Mr. Heiberg's testimony, his written report makes clear that he did take into account Vicuna's use of the machine, concluding it was foreseeable, as addressed earlier. I cannot exclude Mr. Heiberg's testimony based on one stray statement indicating a predisposition toward his client, especially considering the overall context here. Mr. Heiberg's proffered testimony is thus relevant and reliable.

## III.    Defendant's Motion for Summary Judgment

### A.  Design Defect - Strict Liability

"A cause of action in strict products liability lies where a manufacturer places on the market a product which has a defect that causes injury." *Robinson v. Reed-Prentice Div. of Package Mach. Co.*, 49 N.Y.2d 471, 478 (1980) (citation omitted). A strict products liability claim based on a design defect theory "is premised on a manufacturer's failure to properly design a product, which is then placed on the market despite posing inappropriate risks." *Reed v. Pfizer, Inc.*, 839 F. Supp. 2d 571, 577 (E.D.N.Y. 2012) (citing *Voss v. Black & Decker Mfg.*, 59 N.Y.2d 102, 107 (1983)).

To prove a design defect, plaintiffs must show: "(1) the product as designed posed a substantial likelihood of harm; (2) it was feasible to design the product in a safer manner; and (3) the defective design was a substantial factor in causing plaintiff's injury." *Simon v. Smith & Nephew, Inc.*, No. 13-cv-1909, 2013 WL 6244525, at *5 (S.D.N.Y. Dec. 3, 2013) (collecting cases).

The record is replete with indications that the Model 60 in question here suffered from a design defect. The plaintiffs have submitted proffered expert testimony by their retained engineer, Mr. Heiberg. *See supra* section II.B. That report is thorough and spells out in great detail that the Model 60 could operate in manual mode without the safety of a secured interlocking guard to protect operators. According to Mr. Heiberg, such a design contravened industry standards as well as prudent design. *Id.* His report refers to, among other things, the standards set out in the Accident Prevention Manual published by the National Safety Council as well as the standards set out in the American National Standard for Packaging Machinery and Packaging Related Converting Machinery. *Id.*

Moreover, the defect could have been remedied inexpensively without changing the utility of the Model 60, according to Mr. Heiberg. *Id.* His report proposes two alternative designs for the Model 60—both of which I explained earlier—including analyses of feasibility, costs, and utility. *See supra* section II.B.

The record further shows that the design defect was a substantial factor contributing to the plaintiff's injuries. Had protective guarding blocked the plaintiff's access to the pinch point, no accident would have occurred. Moreover, it is reasonably expected that lack of guarding would lead to an operator's unsafe contact with the pinch point. As stated earlier, a Schuman employee testified that, at the time of design, the designers of the Model 60 contemplated that operators

might use the machine in manual mode without the protective guard in place. *Id.* The Schuman employee further testified that this presented safety concerns. *Id.* Moreover, the operator's manual for the Model 60 contemplates use of the machine in manual mode, albeit for limited purposes. A reasonable jury could find proximate cause here. *See supra* section II.B.; *see, e.g.*, *Mustafa v. Halkin Tool, Ltd.*, No. 00-cv-4851, 2007 WL 959704, at *12 (E.D.N.Y. March 29, 2007) ("... the absence of a safeguard for use with foot pedal actuation was a substantial factor in causing plaintiff's injury ...").

### B.  Manufacturing Defect

Under New York law, "To state a claim for manufacturing defect under theories of strict liability [or] negligence . . . the plaintiff must allege that (1) the product was defective due to an error in the manufacturing process and (2) the defect was the proximate cause of plaintiff's injury." *Rosen v. St. Jude Med., Inc.*, 41 F. Supp. 3d 170, 198 (N.D.N.Y. 2014) (collecting cases). Plaintiffs do not dispute whether a manufacturing defect exists in this case and offer no evidence or discussion relating to this issue, even though they would bear the burden of establishing a manufacturing defect at trial. *See generally* Pls.' Mem. Opp'n Def.'s 2d Mot. Summ. J., Feb. 17, 2017, ECF No. 98-12. Schuman's motion for summary judgment on the claim of manufacturing defect is therefore granted. *See Celotex Corp.*, 477 U.S. at 322 ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."); *Hodge v. City of Long Beach*, 433 Fed. App'x 17, 19 (2d Cir. 2011) (summary order) ("Where the non-moving party fails to provide evidentiary support for an essential element of its claim for which it bears the burden of proof, summary judgment is warranted.").

### C. Express Warranty

A claim for express warranty requires that the plaintiffs show: "(1) plaintiff[s] and defendant entered into a contract; (2) containing an express warranty by the defendant with respect to a material fact; (3) which warranty was part of the basis of the bargain; and (4) the express warranty was breached by defendant." *Promuto v. Waste Mgmt., Inc.*, 44 F. Supp. 2d 628, 642 (S.D.N.Y. 1999) (citing *CBS Inc. v. Ziff-Davis Pub. Co.*, 75 N.Y.2d 496, 501-06 (1990)). Again, the plaintiffs here do not dispute whether an express warranty was made and they offer no discussion of this issue in their briefing, notwithstanding that plaintiffs will have the burden of proof on this claim at trial. *See generally* Pls.' Mem. Opp'n Def.'s 2d Mot. Summ. J., Feb. 17, 2017, ECF No. 98-12. I therefore grant Schuman's motion for summary judgment on the express warranty claim. *See Celotex Corp.*, 477 U.S. at 322; *Hodge*, 433 Fed. App'x at 19.

### D. Implied Warranty

An "implied warranty is breached where the product in question is not fit for the ordinary purpose for which it is to be used." *Cavanagh v. Ford Motor Co.*, No. 13-cv-4584, 2014 WL 2048571, at *5 (E.D.N.Y. May 19, 2014). In New York, liability under theories of strict products liability and implied warranty are essentially the same. *See Dalton v. Stedman Mach. Co.,* No. 05-cv-0452, 2008 WL 351676, at *7 (N.D.N.Y. Feb. 7, 2008) (summarizing New York law and stating that "[t]he [New York] Court of Appeals has held that liability under strict products liability and implied warranty theory are essentially the same, except that under the implied warranty theory, it is not necessary to show the feasibility of alternative designs or the manufacturer's reasonableness in marketing it in the unsafe condition." (citing *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 261-63 (1995))).

Schuman's motion for summary judgment is therefore denied regarding implied warranty for the same reasons that the plaintiffs' strict liability claim remains, as discussed above. *See also Audi Vision Inc., RCA Mfg. Co.*, 136 F.2d 621, 625 (2d Cir. 1943) ("[T]here seems no question that in the long run fragmentary disposal of what is essentially one matter is unfortunate not merely for the waste of time and expense caused the parties and the courts, but because of the mischance of differing dispositions of what is essentially a single controlling issue.").

### E. Design Defect - Negligence

Under New York law, "the strict liability concept of defective design is," in general, "functionally synonymous with the earlier negligence concept of unreasonable designing." *Denny*, 87 N.Y.2d at 255; *see also Jarvis v. Ford Motor Co.*, 283 F.3d 33, 63 (2d Cir. 2002) (quoting *Denny*). Schuman's motion for summary judgment therefore fails on the claim of negligent design, just as its motion failed on the claim of strict liability.

### F. Plaintiff's Negligence

Schuman asserts that it is excused from liability here because the plaintiff's own actions contributed to her injury—namely, operating the Model 60 in manual mode without secured guards and then reaching her hand into the pinch point area during operation. *See* Def.'s Mem. Supp. Mot. Summ. J., at 23. A defendant may defeat a products liability claim for strict liability when the plaintiff's actions constitute the "sole proximate cause" of her injuries. *See Yun Tung Chow v. Reckitt & Colman, Inc.*, 17 N.Y.3d 29, 34 (2011). That is not the case here, where the record indicates that the plaintiff used the Model 60 in a foreseeable manner, as addressed earlier. *See id.* (denying defendant's motion for summary judgment where plaintiff's misuse of devise in question was foreseeable); *Mustafa*, 2007 WL 959704, at *12 ("Additionally, it is clear that Mustafa's conduct, however culpable, was not the sole cause of the accident,

insulating Halkin from liability. Even though reaching into the point of operation without first pushing the stop button or removing his foot from the pedal may have been a negligent act contributing to the accident, had the point of operation been guarded this accident never would have happened.").

### G.  Failure to Warn - Successor Liability

I have already discussed at length Schuman's motion for summary judgment on the independent failure to warn claim. Again, that claim should proceed to a jury determination. Separate and apart from that discussion is the plaintiffs' claim against Schuman for failure to warn as the successor to S.K.S. *See* Mem. & Order, May 19, 2015, at 18. On this issue, I note for the record that Schuman has not moved for summary judgment. *See* Mem. Supp. Def.'s Mot. Summ. J., at ii. This is surprising because Schuman appears to have moved for summary judgment on every other outstanding claim. *See id.* Schuman has further sought dismissal of "all claims and counterclaims." *Id.* at 24. Indeed, it would appear that Schuman's failure to move for summary judgment on this successor issue was an oversight. Thus, while I will not reach the merits of that claim today, I remind the parties that it remains a cause of action for trial.

### H.  Loss of Services

The plaintiffs' claim for loss of services is derivative of the underlying claims.  Schuman's motion for summary judgment on this claim is therefore denied.

### IV.  Subsequent Remedial Measures

I observe that Schuman objects throughout its briefing to the plaintiffs' use of the alternative schematic on grounds that the schematic represents a subsequent remedial measure inadmissible pursuant to Federal Rule of Evidence 407. *See, e.g.*, Def.'s Mem. Opp'n Pls.' Mot.

for Reconsideration, at 1. Nevertheless, the schematic dates from *before* the injury in this case. *See, e.g.*, Resp. to Pls.' Supp. Not. to Produce, at 5 (dated 1996). Thus, while the schematic may have been created after the initial manufacturing of the machine in question here, it does not represent a subsequent remedial measure within the meaning of Rule 407. Indeed, Rule 407 only prohibits admission of measures "that would have made an *earlier* injury or harm less likely to occur." Fed. R. Evid. 407 (emphasis added). Moreover, subsequent remedial measures are inadmissible only with respect to certain issues, such as negligence. *Id.* In this case, the plaintiffs use the schematic to prove feasibility as well as for other permissible purposes. *See supra* sections I.B.1. & II.B.; *In re Joint Asbestos Litig.*, 995 F.2d 343, 345 (2d Cir. 1993).

## V.      Plaintiffs' Motion for Costs and Attorney's Fees

The plaintiffs request costs and attorney's fees. I decline to award such costs or fees against Schuman at this time. Schuman's presentation was not wholly frivolous, and Schuman did in fact prevail on a number of the issues litigated. *See Odeon Capital Grp. LLC v. Ackerman*, 864 F.3d 191, 198 (2d Cir. 2017) (decision to award attorney's fees is within district court's discretion).

## VI.     Plaintiffs' Motion for Leave to Amend Complaint

The plaintiffs move for leave to amend their complaint. They wish to add six paragraphs that they omitted inadvertently from the version of their complaint last filed with the court. *See* Mot. to Amend Compl., Dec. 6, 2016, ECF No. 76, at 1. Leave to amend should be freely given when justice so requires. Fed. R. Civ. P. 15(a)(3). The defendant Schuman has not shown any prejudice that would result from amendment to the complaint in the manner described. *See, e.g.*, Ltr. Opp'n Mot. to Amend Compl., Dec. 8, 2016, ECF No. 78, at 1. I grant the plaintiffs leave to amend their complaint.

**CONCLUSION**

Pursuant to the foregoing, I hereby order:

- The plaintiffs' motion for reconsideration of my decision dated May 19, 2015 is **GRANTED**, and upon reconsideration Schuman's motion for summary judgment on the independent failure to warn claim is **DENIED**;
- Schuman's motion to preclude the plaintiffs' expert and his testimony is **DENIED**;
- Schuman's motion for summary judgment is **DENIED** in part and **GRANTED** in part, consistent with this memorandum;
- The plaintiffs' motion for costs and attorney's fees is **DENIED**; and
- The plaintiffs' motion for leave to amend their complaint is **GRANTED**.